IN the INTEREST OF R.S.-T., a Child

No. 04-16-00724-CV

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: May 17, 2017

Jerry Reyes, Texas Department of Family and Protective Services, Austin, TX, Jacqueline Phillips, 25th Judicial District Attorney, Seguin, TX, for Appellee.

James B. Peplinski, Law Office of James B. Peplinski, San Antonio, TX, Sandra Garcia Huhn, Law Office of Sandra Garcia Huhn, Schertz, TX, for Appellants.

Sitting: Sandee Bryan Marion, Chief Justice, Patricia O. Alvarez, Justice, Luz Elena D. Chapa, Justice

## OPINION

Opinion by: Patricia O. Alvarez, Justice

This is an accelerated appeal of the trial court's order terminating Appellants Ralph's and Carla's[1] parental rights to their child, R.S.-T. Ralph contends the evidence does not support the trial court's termination based on Texas Family Code subsections 161.001(1)(b)(D), (E), and (O). TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (West Supp. 2016). Ralph also contends the trial court failed to properly conduct the requested de novo hearing pertaining to the parental terminations. Carla, on the other hand, does not argue that the evidence was insufficient to support the trial court's findings that she violated statutory grounds for termination. Instead, she asserts the evidence is neither legally nor factually sufficient for the trial court to have found by clear and convincing evidence that terminating her parental rights is in R.S.-T.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Because we conclude the evidence is legally and factually sufficient to support the trial court's findings in both cases, we affirm

1. To protect the minor's identity, we refer to the father, mother, and child by aliases. *See*

the trial court's order terminating Ralph's and Carla's parental rights to R.S.-T.

## FACTUAL AND PROCEDURAL BACKGROUND

Carla gave birth to R.S.-T. on August 7, 2014. The next day, on August 8, 2014, the Texas Department of Family and Protective Services received a referral alleging physical abuse and neglectful supervision of newborn R.S.-T. R.S.-T.'s mother, Carla, tested positive for marijuana on two different prenatal visits and, after delivery, the nursing staff expressed concern that Carla's cognitive delay might affect the child's care following his release from the hospital. The Department set up a formal safety plan requiring that (1) the hospital release R.S.-T. only if Carla's parents were present and (2) Carla reside with her parents.

R.S.-T. was released from the hospital in accordance with the safety plan. Within a couple of days, however, Carla moved out of her parents' residence. During the next six weeks, the Department's numerous voice messages and attempts to contact Carla, and to ensure the safety of R.S.-T., went unanswered.

On September 22, 2014, the Department's investigator finally located Carla and R.S.-T. The six-week old baby appeared lethargic and withdrawn. The child was taken to an emergency room in Guadalupe County and ultimately transferred to a children's hospital in San Antonio. The following day, on September 23, 2014, the Department filed its Original Petition for Protection of a Child and for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship. Included in the motion was a request for emergency temporary orders naming the Department as Sole Temporary Managing Conservator

TEX. R. APP. P. 9.8.

of R.S.-T. with the exclusive right to physical possession of the child.

On October 23, 2016, after several permanency hearings, a multiple-day bench trial on the merits before the associate judge, and a de novo hearing before the district court judge, Ralph's and Carla's parental rights to R.S.-T. were terminated based on (1) subparagraphs (D), (E), and (O) of section 161.001(b)(1),[2] *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), and (2) a determination that such termination was in the child's best interests, *see id.* § 161.001(b)(2).

## SUFFICIENCY OF THE EVIDENCE

### A. Standards of Review

▮▮▮ "Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent. *Id.* (citing *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.)).

2. Texas Family Code sections 161.001(b)(1)(D), (E), and (O) provide as follows:
   (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
   (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
   (O) failed to comply with the provisions of a court order that specifically estab-

An order terminating parental rights must be supported by clear and convincing evidence that (1) the parent has committed one of the grounds for involuntary termination as listed in section 161.001(b)(1) of the Family Code, and (2) terminating the parent's rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2003). " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *J.F.C.*, 96 S.W.3d at 264.

▮▮▮ "There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on [the Department] to rebut that presumption." *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "The same evidence of acts or omissions used to establish grounds for termination under section 161.001[ (b) ](1) may be probative in determining the best interest of the child." *Id.*

#### 1. Legal Sufficiency

▮▮▮ When a clear and convincing evidence standard applies, a legal sufficiency review requires the appellate court to "look at all the evidence in the light most favorable to the finding to determine

lished the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O).

whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *J.F.C.*, 96 S.W.3d at 266). If the court "determines that [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally [sufficient]." *See id.* (quoting *J.F.C.*, 96 S.W.3d at 266). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

### 2. Factual Sufficiency

■■■ Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *accord In re K.R.M.*, 147 S.W.3d 628, 630 (Tex. App.—San Antonio 2004, no pet.). We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266; *accord C.H.*, 89 S.W.3d at 25. "If, in light of the entire record, [unless] the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, . . . the evidence is factually [sufficient]." *J.F.C.*, 96 S.W.3d at 266.

### B. Testimony Elicited During the Termination Hearing before the Associate Judge

Applying the applicable standards of review for sufficiency of the evidence, we examine all the evidence presented during the termination hearing. *See J.F.C.*, 96 S.W.3d at 266; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (crediting or disregarding evidence for legal sufficiency). The associate judge heard several days of testimony from multiple witnesses, including Ralph, the caseworkers, doctors, and the foster mother. The judge also heard arguments from the Department's attorney, the children's ad litem, and respective counsel for Ralph, Carla, and the foster parents.

Because Ralph challenges the trial court's finding that he committed one or more of the statutory grounds of involuntary termination and Carla challenges the trial court's finding that termination was in R.S.-T.'s best interest, a more in-depth presentation of the facts is warranted.

### Texas Department of Family and Protective Services Employees

#### 1. Lori Dickens

The Department's first witness was Investigator Lori Dickens. At the time of the trial, Dickens had been an investigator for approximately three years. Dickens was assigned to newborn R.S.-T.'s case on August 8, 2014. The original allegations included physical abuse and neglectful supervision: Carla tested positive for marijuana on two different prenatal visits and, after delivery, the nursing staff expressed concern that Carla's cognitive delay might affect the child's care following his release from the hospital.

Dickens met with Carla at the hospital; the meeting was very pleasant and R.S.-T. was in the room with her at the time. Carla reported that R.S.-T.'s father, Ralph, was at the birth and they were a couple, but not married. At the time of their meeting, Ralph had left the hospital

to shower and take a nap. Carla explained that one of the marijuana tests was the result of second-hand smoke during a baby shower; she offered no explanation for the other positive test.

With regard to R.S.-T., Dickens described Carla as apprehensive. Carla explained that she suffered brain trauma following an automobile accident and she was concerned about dropping the baby. Dickens and Carla discussed the need for Carla to stay with Carla's parents when she left the hospital; Dickens noted that Carla appeared somewhat unrealistic about her parents' physical impairments and the effect on the amount of assistance they might be able to provide.

Dickens set up a formal safety plan with Carla and specifically explained that the plan prohibited the hospital from releasing R.S.-T. unless Carla's parents were present; the plan also required Carla to reside with her parents. Dickens explained to Carla that following her release from the hospital, Dickens would visit Carla at her parents' home to check on the home and R.S.-T.

Dickens testified that she called the residence on August 14, 2014; when no one answered, Dickens left a message requesting Carla return her call. On August 15, 2014, Dickens attempted to make contact with Carla, in person, at her parents' house. No one answered the door and Dickens left a note on the door for Carla to contact her. Dickens testified that she made several phone calls between August 15, 2014, and August 23, 2014, to both Carla's cellphone and to the home phone.

On August 23, 2014, Dickens finally spoke to Carla's father. He was upset and informed Dickens that Carla left town with Ralph and R.S.-T. Both he and his wife told Carla about the notes and messages left by Dickens, and they encouraged Carla to make contact with Dickens. Dickens continued to call Carla's cellphone and the home phone in attempts to reach Carla.

On September 16, 2014, Dickens again called the home phone and Carla's mother answered. Carla's mother reported that Carla was out running errands and R.S.-T. was with her. Carla's mother reported that R.S.-T. was gaining weight and appeared to be doing well overall.

On September 19, 2014, Dickens again called the home phone and Carla's father reported Carla was living in San Marcos and that he relayed to Carla the urgency to contact Dickens. Carla's father also provided the paternal step-grandmother's name. Dickens proceeded to contact the paternal step-grandmother who denied knowing Carla's whereabouts. Dickens requested that she give Carla the contact information and relay the urgency of Carla contacting the Department.

Carla finally contacted Investigator Dickens that evening. Carla agreed to meet Dickens at her parents' home in Seguin the following Monday. Carla remembered Dickens and she understood that she was in violation of the Department's safety plan. Carla replied that she and Ralph were simply taking R.S.-T. to see different family members. In between visits, Carla explained that she and R.S.-T. had been staying with Ralph at his father's and step-mother's home.

On September 22, 2014, Dickens made face-to-face contact with Carla. Dickens testified that she was shocked by R.S.-T.'s appearance. R.S.-T.'s coloring was poor, his previously round, rosy cheeks were thin and drawn, his hair appeared to be falling out, he was lethargic, and R.S.-T. was relatively unresponsive to Dickens's holding him. Dickens inquired whether Carla had taken R.S.-T. to the pediatrician for newborn care; Carla reported she had only recently selected a pediatrician from

Medicaid. Carla further explained that she did not take R.S.-T. for his initial check-up after leaving the hospital because she lacked transportation.

Dickens then requested that Carla feed the child while she was there. Carla proceeded to fill the bottle with three ounces of water and a three-quarters-full scoop of baby formula powder. Dickens immediately explained and demonstrated for Carla that for every two ounces of water, Carla needed to use a full scoop of formula. The proper bottle was prepared and R.S.-T. drank the entire bottle. Dickens testified that Carla's feeding R.S.-T. raised further concerns. "Once he would start to suckle and really latch onto it, she would pull it out." Dickens again demonstrated proper bottle techniques. When R.S.-T. finished his bottle, Dickens requested Carla prepare another bottle to ensure that Carla understood the proper amount of formula required. Dickens testified that Carla did not properly mix the formula. Dickens again showed Carla how to mix the formula and reiterated that mixing the right proportions was vital to R.S.-T.'s nutritional needs. Dickens also told Carla that she would contact Medicaid and attempt to set up an immediate appointment with the doctor Carla had previously selected.

When Dickens contacted Medicaid, they had no record of Carla requesting a primary care physician for R.S.-T. Dickens testified that she had concerns regarding R.S.-T.'s physical health. After speaking to her supervisor, Dickens transported Carla and R.S.-T. to the emergency room. When they arrived at the emergency room, Carla was able to relay to the triage nurse Dickens's concerns about R.S.-T.'s weight and that Carla felt he was constipated. The emergency room doctor determined that R.S.-T. was dehydrated and requested transport to the children's hospital in San Antonio. R.S.-T. was diagnosed with fail-ure to thrive and hospitalized for approximately one week. Dickens requested an emergency removal; when R.S.-T. was released, he was taken directly to the foster home where he has remained.

Dickens testified the purpose of the safety plan was to ensure R.S.-T.'s safety, and Carla's failure to comply with the safety plan put R.S.-T. in danger necessitating his removal. Additionally, Dickens testified that she did not see any problems with R.S.-T.'s attaching to the bottle. He was able to suck, swallow, and breathe as necessary without excessive spit-up.

Dickens also testified that she first met Ralph during an adversary hearing. He was living with his parents in San Marcos. Although he was not on the original service plan, he knew the Department was involved in R.S.-T.'s removal Ralph did not take any initiative to contact Dickens or the Department. Upon further questioning, Ralph acknowledged knowing that Carla tested positive for marijuana during her pregnancy. Ralph declined Investigator Dickens's request to submit to a drug test.

### 2. Rocky Steven Henserling

Rocky Henserling, a master conservatorship supervisor for the Department, was the second witness called to testify. Henserling was R.S.-T.'s primary caseworker from May to September in 2015. Henserling testified neither Ralph's father or Ralph's step-mother requested contact or visitation with R.S.-T. During his first meeting with Ralph and Carla, Henserling reviewed the Department's service plan for each parent and any uncompleted services.

Henserling relayed that, in May of 2015, Carla completed her psychological evaluation, but the Department had not yet secured a doctor to complete the suggested neuropsychological evaluation. Henserling also expressed concern regarding the con-

tinued allegations of domestic abuse between Ralph and Carla and the effects of such abuse on a child in the home. Carla had not completed parenting classes, individual counseling, or domestic violence classes. Ralph had not completed a requested substance abuse assessment, individual therapy, parenting classes, or domestic violence classes.

Following the July 20, 2015 permanency hearing, the trial court signed an order requiring that Carla complete her neuropsychological evaluation, individual therapy, domestic violence classes, and a parenting workshop. Ralph still needed to complete the substance abuse assessment, domestic violence classes, individual therapy, and parenting classes. By September 21, 2015, the Department finally secured a provider for the neuropsychological evaluation and the trial date was rescheduled for a later date. Henserling explained that although Ralph completed the substance abuse assessment, neither parent made significant progress with their individual therapy or domestic violence classes.

Regarding visitation, Ralph engaged and interacted well with R.S.-T. Ralph met R.S.-T.'s physical needs, showed affection, and was appropriate throughout the visits. Ralph's visitation record was tarnished by the times he would "no show" or be late. Henserling further testified that Carla's largest obstacle with visitation was scheduling issues. The Department attempted to be very flexible, changing times and days of the week. Carla would be employed for a period of time and attend visitation; at other times, she simply would not show up. When she did visit, Carla tended to treat R.S.-T. like a newborn baby with very infantile and soft-spoken terms. Carla wanted to cradle R.S.-T. and did not appear to understand that the toddler was growing and developing and wanted to explore his surroundings.

When asked for his recommendation, Henserling did not believe either Ralph, who was incarcerated at the time of the hearing, or Carla could provide a safe and stable home for R.S.-T. Carla could barely meet her own basic needs and there was a relatively extensive domestic abuse history between Ralph and Carla. Henserling attempted to assist Carla in meeting her appointments and obligations. On cross-examination, he testified that each of the service plans he develops are modified and customized for each individual parent. Henserling explained to Carla the importance of attending the classes, the counseling sessions, and regular visits with R.S.-T. He even provided Carla with a calendar and showed her how to plan for transportation and appointments.

Henserling also testified that, during his time with the Department, he successfully worked with several parents with cognitive limitations. With Carla, Henserling was concerned with her support network and her unrealistic expectations of the people around her. For example, Carla's mother suffered a stroke, but Carla appeared to believe the symptoms would simply disappear when R.S.-T. came home; "my mom is going to be better and she's going to run after him and chase him around and play with him. She's just really sad because he's not home."

Finally, Henserling testified regarding the love shown by the foster parents. They love R.S.-T. as if he was their own; their home is the only home R.S.-T. has ever known. Henserling described R.S.-T. as a very happy baby, with an adorable smile and very bonded with his foster parents. The foster parents even allowed Carla and Ralph to visit R.S.-T. at their home and presented themselves as a support family and attempted to model proper and appropriate child care. "I really feel like they tried to go above and beyond to help sup-

port reunification with these first time parents [Ralph and Carla]."

### 3. Cillie Anderson

Cillie Anderson, the program director for the Department, testified regarding her meeting with Carla on April 6, 2015. Carla was upset because she had not seen R.S.-T. in over a month; Anderson's concern was more immediately focused on the bruises and scratches on the left side of Carla's neck. When asked about the bruises, a crying Carla relayed that she and Ralph argued over the weekend and Ralph strangled and scratched her. Carla assured Anderson that she was safe and that she had moved back to Seguin and was living with her parents. Anderson took photographs of Carla's injuries; the photographs were admitted during the termination hearing. Carla also told Anderson about several other occasions where Ralph's abuse caused her black eyes and nosebleeds and also showed her a scar Carla received as result of Ralph's step-mother scratching her. During cross-examination, Anderson confirmed the Department's investigation revealed Ralph and Carla were engaged in battering each other.

Anderson testified that Carla's cognitive abilities and disabilities were not a part of the Department's recommendation for placement. To the contrary, Anderson was adamant that the Department's decision was based primarily on Carla's inability to appropriately care for R.S.-T. and the family domestic violence—which creates anxiety and fear in children. Anderson relayed that the Department considered Ralph's father and step-mother for placement on four different occasions. In October of 2014, they were denied based on too many young children in the home and issues with clutter and cleanliness in the home. On March 30, 2015, although two of the younger children were no longer in the home, there were still issues with the home's cleanliness and whether the children in the home were being fed. On April 16, 2015, the Department noted a referral was called in regarding physical abuse and disparate treatment in the home. The child that was the subject of the disparate treatment was removed from the home and placed with his father. Lastly, in December of 2015, the Department did not approve placement based on criminal histories of Ralph's father and step-mother and concerns related to frequent visitors to the home with criminal histories.

### 4. Crystal Smith

Crystal Smith, a Department caseworker, testified regarding her observations during Carla's and Ralph's visitations with R.S.-T. R.S.-T. is a happy little boy and was always pleased to see both Carla and Ralph. Prior to each, the foster mother would pack a lunch containing food and two sippy cups. Even with Smith's encouragement and explanations that R.S.-T. needed to eat the food, Carla only opted to give R.S.-T. the sippy cups. Smith also described an obsessive nature in the way Carla would change R.S.-T.'s diaper. At the beginning of each visit, Carla would immediately change his diaper—even when the diaper was not soiled. What alarmed Smith, however, was Carla's incessant wiping of R.S.-T.'s genitals "anywhere from 10 to 15 minutes sometimes," and Smith never saw a diaper that was anything more than slightly wet with urine.

Smith described the foster family as loving and very supportive. R.S.-T. has several young foster siblings in the home, all adopted through the Department. Smith opined that the foster parents were more than able to care for the children. The house was clean, with plenty of room for each of the children. According to Smith, R.S.-T. was thriving in the foster home. The foster family was committed to caring for R.S.-T. and they hoped to adopt R.S.-T.

Smith strongly believed that such adoption was in R.S.-T.'s best interest.

### 5. Brittany Brumme

Department supervisor Brittany Brumme opined that termination of both Carla's and Ralph's parental rights was in R.S.-T.'s best interest.

> Neither of the parents in this case have been able to demonstrate they could maintain a safe and stable home or provide for this child. . . . Dad has been in and out of jail at least twice during the pendency of this case. We have offered services to both parents. Neither of the parents [has] completed counseling which is a huge concern since that's one of the main services that would have offered, you know, them an ability to change their lifestyle and learn how to better care for the child. [R.S.-T.] is extremely bonded with his foster family. He's been there almost 16 months. This is basically the only family that he knows as his family. Beyond that parents not taking advantage of services that have been offered to them, not being able to demonstrate that they can provide that safe and stable home, and not being able to demonstrate that they [will] be able to meet [R.S.-T.]'s needs.

Brumme also expressed concern regarding the domestic violence and substance abuse in R.S.-T.'s home and Ralph's and Carla's failure to understand the seriousness of both. Brumme testified that she believed the counseling services offered to Carla were sufficient to meet her needs had she taken advantage of the services.

Carla's attorney spent significant time discussing the Department's failure to timely provide a neuropsychological evaluation and the Department's failure to appropriately modify Carla's service plan based on her mental disabilities. Brumme explained that although no written changes were made to the Department's service plan, like in all Department cases, the plan was continually informally modified. The neuropsychological evaluation provided guidance that Carla's intellectual limitations would require repetition in the learning process. The Department and the service providers attempted to demonstrate the skills and explain the importance of Carla following through at each appointment. When the neuropsychological evaluation was received, R.S.-T.'s case was again staffed by the Department. Brumme explained that based on the neuropsychological evaluation, the psychological evaluation, and the caseworkers' one-on-one contacts with Carla, Brumme and the other Department staff felt that the accommodations in place were reasonably designed to assist Carla in learning the identified skills. Brumme opined that Carla's failure to participate in counseling, not her intellectual or mental limitations, was the greatest obstacle to the Department's efforts to reunify mother and child.

### Professionals Not Employed by the Department

### 6. Jane Tomlinson

Jane Tomlinson, a licensed professional counselor, began working with both Ralph and Carla in January 2015. Tomlinson described the counselor-patient relationship as sporadic, with many "no shows." She saw Carla for a total of six visits and Ralph for a total of eight. Carla and Ralph's relationship was also sporadic, breaking up and then reuniting. Tomlinson testified that Ralph never took responsibility for R.S.-T.'s condition when the Department intervened. To the contrary, Ralph considered R.S.-T.'s care Carla's responsibility.

### 7. Ann Marie Hernandez

Dr. Ann Marie Hernandez, a psychologist with a Ph.D. in clinical psychology,

conducted a psychological evaluation [1] of Carla. Hernandez described Carla as follows:

> [S]he had a rather slow and pressured response pattern which is outside the norm. That combined with her depressive symptoms led me to a diagnosis of a potential for mild cognitive disorder due to traumatic brain injury, as well as major depressive and a substance issue.
>
> . . . .
>
> [I]t was more of a long-standing issue that was potentially worsened by the brain injury . . . .

Dr. Hernandez opined that providing demonstrations would help Carla learn new skills. More specifically, Carla needed to observe the task over a period of time. For example, showing her a "few times" how to fix a bottle may not be sufficient. Additionally, teaching the skills within Carla's own environment would assist her cognitive functioning.

Dr. Hernandez's written psychological evaluation was also admitted in its entirety. Carla described R.S.-T. as "demanding" and acknowledged that her "pride" often prevents her from seeking help when she is overwhelmed. Carla also relayed an extensive substance abuse problem that began long before the car accident resulting in the trauma to her brain. Dr. Hernandez documented alcohol consumption of forty-eight beers in a single episode, use of pain medications every other day "to cope with stress," and cocaine use beginning in her teen years. Carla reported using "anything I could get my hands on."

On cross-examination, Dr. Hernandez conceded that Carla's lack of consistent participation in the services offered by the Department would have affected her ability to perform the necessary skills. Additionally, Dr. Hernandez acknowledged the demonstrations by the Department's case-workers, investigator, and foster parents were the type of intervention that she was recommending.

### 8. Dr. DeAnna Dance-Kwan and Other Hospital Personnel

Dr. DeAnna Dance-Kwan was the pediatric doctor in charge of R.S.-T.'s care during his hospitalization. Dr. Dance-Kwan testified that R.S.-T. was admitted for failure to thrive and medical neglect. No organic basis was found to account for the failure to thrive. Although R.S.-T. gained some weight during his first six-weeks, it was inadequate to support the growth necessary for him to "fully develop his brain, his organs to achieve the height that he would normally achieve, to achieve the weight he would normally achieve, to achieve the head circumference he would normally achieve." She further described failure to thrive as having the potential to cause serious harm to R.S.-T. Carla's failure to take R.S.-T. for the standard two-week follow-up doctor's appointment prevented earlier medical intervention.

The hospital's lactation consultant and a nurse both testified that notes and standard protocol indicated that Carla was shown how to properly feed R.S.-T. Additionally, although the records indicate R.S.-T. may have initially experienced some slowness in suck, swallow, breathe coordination, it was not sufficient to require his continued hospitalization.

### Family and Interested Parties

### 9. Ralph

Ralph, R.S.-T.'s father, was incarcerated for traffic tickets at the time of the hearing. He testified that he and Carla began dating when they were teenagers. When asked about the domestic abuse, Ralph downplayed the physical aspect explaining, it "[j]ust got out of hand . . . . Just both of us and fighting. We got mad, both of us." After R.S.-T. was born, Carla lived part-

time with her parents and part-time with Ralph and his parents. Ralph contended that he would help after work sometimes, I "[fed] him one time." Ralph testified that he understood R.S.-T. was removed from the home for failure to thrive because Carla was not properly mixing the bottles.

Department: What responsibility did you have in for—for ensuring that your son was properly fed?

Ralph: I was—in feeding him?

Department: Uh-huh.

Ralph: Well, [Carla] did most of the feeding. I hardly did the bottles.

Department: But did you have any responsibility for making your son was properly—making sure your son was properly cared for?

Ralph: I just bought the milk. I bought everything. That's the only—I was working for the money. But she did most of the taking care of.

Ralph further testified that he lived with his sister and had not provided any support for R.S.-T. during the past year. He acknowledged that his sister's house required repairs before it would be appropriate for a small child; yet, he did not take any steps to make the repairs. Ralph further admitted that he understood his failure to comply with the service plan could result in the termination of his parental rights. He acknowledged that he did not complete any of the court ordered services: outpatient drug treatment; counseling—"I was having problems getting to Seguin because my car kept messing up;" domestic violence class—"I just never did;" or parenting class—"Started but never finished."

During cross-examination, Ralph conceded that he knew the Department was trying to locate Carla and R.S.-T. shortly after he was born. Ralph testified that he told Carla to call the investigator, but he did not make any contact himself. Finally, Ralph acknowledged being incarcerated twice since R.S.-T.'s removal; on both occasions Ralph elected to accept jail time for outstanding tickets and driving without a license. Ralph also admitted that he missed so many visits at the foster family's home that the visits were ultimately discontinued.

### 10. Foster Mother

R.S.-T.'s foster mother testified that she has been a foster mother with the Department for almost eight years and has fostered fifteen children. She and her husband have adopted four children, currently between the ages of five and one years' old. R.S.-T. was six-weeks old when he was placed in her home for a short-term foster. R.S.-T.'s foster mother explained that she opened her home to Carla and Ralph because she "really wanted to help them." She testified that their visitation was sporadic and they even showed up without an appointment on one occasion. R.S.-T. is now eighteen-months old; he is active, thriving, growing, and bonded to the entire family.

### 11. Paternal Grandfather

Ralph's father, the paternal grandfather, testified that he saw R.S.-T. approximately five or six times during the first six-weeks of his life. Ralph and Carla would bring R.S.-T. to his house in San Marcos. Since R.S.-T.'s removal, the paternal grandfather testified that he has visited numerous times with R.S.-T. He also explained that he and his girlfriend had cared for several of his grandchildren and were in the process of adopting one of the children. He provided Ralph financial assistance when Ralph asked, but he has not provided Carla with any financial assistance.

R.S.-T.'s paternal grandfather testified that he and Ralph's step-mother want to

adopt R.S.-T. When asked why, he explained:

> I think [Ralph and Carla] can't take care of him, so we can take care of him.
>
> . . . .
>
> Right now they're having a hard time.

Neither Carla nor her parents testified at the termination hearing.

## C. De Novo Hearing before the Trial Court

On August 23, 2016, Twenty-Fifth Judicial District Court Judge W.O. Kirkendall called the case for a de novo hearing. At the start of the hearing, each of the parties agreed that the statement of facts was accurate and that they did not object to the trial court's consideration of the statement of facts. The trial court explained, pursuant to standard protocol, testimony contained within the statement of facts would not be repeated during the de novo hearing. The trial court then instructed the parties to each submit a letter, identifying by line and page, the portions of the statement of facts that "you want me to read."

Ralph's counsel provided the trial court with a background summarizing the events leading up to the termination hearing. Counsel also explained Ralph's assertion that the Department erred in placing R.S.-T. in a non-relative foster home when Ralph's father and step-mother were available, especially in light of the legislative intent for relatives to be given priority. The Department's counsel argued as follows:

> [Ralph] continued to admit to drug use. He admits that he drives without a license. He periodically [goes] to jail each year because he doesn't want to pay his tickets and he will not get a license. That's a thing for him. [Carla] does not have a place to live, [she] is not employed . . . [Carla and Ralph] continue to engage in domestic violence. That's

been going on. There is drug use. [Ralph] talks about giving [Carla] drugs during the pregnancy. He knows she was using drugs, he continues to use them.

> In addition to that, Your Honor, the parents have failed to learn how to feed this child and have failed to acknowledge any culpability in the fact that this child was diagnosed failure to thrive.

In response to placement issues, the Department's counsel reiterated the purpose of the hearing was the termination of parental rights, and not R.S.-T.'s adoption.

The following testimony was elicited during the de novo hearing:

### 1. Crystal Smith

Caseworker Crystal Smith was recalled by the Department. When asked about Carla's visitation, Smith explained that although she tried to explain to Carla that her visits with R.S.-T. were during lunch and that R.S.-T. needed to eat his lunch, Carla would give R.S.-T. a few crackers but Carla repeatedly declined Smith's offers to heat R.S.-T.'s prepared lunch. In Smith's opinion, Carla did not demonstrate any "comprehension about . . . knowing what [R.S.-T.] would need."

Smith further testified that two-year old R.S.-T. is bonded to his foster parents. "He is very attached to them. He goes to them for comfort. . . . He is very happy, he's very playful and he is also very attached to his [four] foster siblings as well." Smith also testified that during the four months since the termination hearing, neither parent has completed any services or asked for assistance in an attempt to complete services.

Following the associate judge's recommendation for termination, the Department agreed to continue visitation pending the de novo hearing. Smith described the

first visitation following termination as very negative. Carla made numerous comments telling R.S.-T. "everyone wants to take her away from him." Smith opined that had R.S.-T. been older, she would have stopped the visit. Carla's hostility towards the Department and its employees became more aggressive. Based on safety concerns, the Department stopped Carla's visitations with R.S.-T.

The Department also removed Ralph's visitation rights following standard drug tests administered prior to visitation. When Smith notified Ralph that his visitation was being canceled based on his positive drug test, "[h]e kind of chuckled. He said, Yeah, I knew that it would be dirty. I was with some friends last weekend, and he admitted to the drug use."

Smith testified that she previously worked with three or four clients that were either disabled or perceived to be disabled for which she made accommodations. Smith acknowledged that she did not think Carla's mistreatment of R.S.-T. was intentional and that Carla suffered "some mental disability." Smith testified that at every visitation, based on the recommendation from the psychological evaluation, she would try to model for Carla and try to have a conversation with her about properly feeding a young child. The conversation, however, would always turn into something defensive. Carla "always addressed herself as not needing any special accommodations and that there was nothing wrong with her." She "would get angry very easy." Carla would ultimately text Smith not to contact her and direct Smith to "go through my attorney."

On cross-examination, Smith acknowledged that she was familiar with the home study of Ralph's father and step-mother conducted by Hays County, but she was not privy to any home study conducted in Guadalupe County.

Smith testified the trial court should affirm the termination based on the statutory violations and that, in her opinion, termination of Carla's and Ralph's parental rights was in R.S.-T.'s best interest.

### 2. Paternal Step-Mother

Ralph's trial counsel recalled his step-mother. She testified that she and Ralph's father are currently adopting Ralph's nephew. Ralph's counsel offered an e-mail from the adoption caseworker, received by the step-mother the previous day, stating that she was "approved by the State" and that a home study was now in process. She further reiterated that placing R.S.-T. in their home was in R.S.-T's best interest. Counsel then offered several pictures of R.S.-T. with Ralph's family members. The trial court admitted the pictures but reiterated that the de novo hearing was limited to the question of parental termination and that alternative placement was not before the court.

### 3. Brittany Brumme

The last witness recalled was Brittany Brumme, the Department supervisor. Based on questioning from Ralph's counsel, Brumme confirmed three caseworkers all concluded Carla's treatment of R.S.-T. was not intentional. Brumme also explained that the Department's failure to place R.S.-T. in Ralph's parents' home was based on their home study, not the home study completed by a different county.

On October 13, 2016, the trial court signed an order terminating both Ralph's and Carla's parental rights and specifically finding the evidence was sufficient to support termination of Ralph's and Carla's parental rights under Texas Family Code section 161.001(b)(1)(D), (E), and (O), see TEX. FAM. CODE ANN. § 161.001(b)(1)(D); (E), (O), and (2) and that termination of each parent's rights was in R.S.-T.'s best interest, see id. § 161.001(b)(2).

We turn first to Ralph's contention the trial court failed to conduct a proper de novo hearing.

## DE NOVO HEARING

On appeal, Ralph argues the trial court's de novo review "cut off" earlier proceedings and prevented consideration of testimony heard before the associate judge. Generally, when a matter is heard de novo, the trial court is limited to the evidence presented during the de novo hearing. *See In re N.T.*, 335 S.W.3d 660, 669 (Tex. App.—El Paso 2011, no pet.). However, Texas Family Code section 201.015(c) provides as follows:

> In the de novo hearing before the referring court, the parties may present witnesses on the issues specified in the request for hearing. The referring court may also consider the record from the hearing before the associate judge, including the charge to and verdict returned by a jury.

TEX. FAM. CODE ANN. § 201.015(c) (West Supp. 2016); *accord N.T.*, 335 S.W.3d at 669; *Leonard v. Leonard*, No. 05-97-00899-CV, 1999 WL 1125245, at *1 n.2 (Tex. App.—Dallas Dec. 9, 1999, no pet.). Prior to any testimony or argument by counsel, the statement of the facts from the hearing before the associate judge was admitted in its entirety without objection. *See* TEX. R. APP. P. 33.1(a) (providing that failure to make a timely request, objection, or motion apprising the trial court of the complaint waives review of the complained of error); *In re A.B.*, 458 S.W.3d 207, 210 (Tex. App.—Dallas 2015, pet. denied).

Because the statute clearly vests the trial court with the authority to consider the record of the hearing before the associate judge, we overrule Ralph's second issue on appeal.

## TERMINATION OF RALPH'S PARENTAL RIGHTS BASED ON STATUTORY VIOLATIONS

### A. Arguments of the Parties

On appeal, Ralph contends there was no evidence that he was aware of and disregarded any potential risk to R.S.-T.

The State counters that based on the investigator's description of the child, and the hospital's reaction to the child's medical condition, it was readily apparent that R.S.-T. was not in good health. Ralph also admitted that he knew the Department was trying to locate Carla, but conceded that he never contacted the Department.

### B. Statutory Violations under the Texas Family Code

The trial court found that Ralph

> knowingly placed or knowingly allowed [R.S.-T.] to remain in conditions or surroundings which endanger [R.S.-T.'s] physical or emotional well-being ...;
> engaged in conduct or knowingly placed [R.S.-T.] with persons who engaged in conduct which endanger [R.S.-T.'s] physical or emotional well-being ...; [and]
> failed to comply with the provisions of a court order[ed service plan]....

*See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), and (O).

### C. Analysis

*1. Texas Family Code Section 161.001(b)(1)(D)*

The statutory ground for termination found in subsection D allows for termination of parental rights if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). The child's "environment" encompasses the suitability of the child's living conditions

and the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D." *Id.* "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Subsection D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

■■■ Under subsection D, the trial court examines "evidence related to the environment of the [child] to determine if the environment was the source of endangerment to the [child]'s physical or emotional well-being," although parental conduct can be a factor that contributes to this environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The relevant period for review of conduct and environment supporting termination under statutory ground D is before the Department removes the child. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

■■■ Ralph contends there is no evidence that Ralph ever visited Carla's parents' home or that he observed the conditions of the home or that he was aware of the Department's investigation or Investigator Dickens's concerns prior to the Department's removal. Similarly, Ralph contends the record does not substantiate that the child's environment when Carla and R.S.-T. were living with Ralph posed a threat of injury or harm to R.S.-T. Ralph contends the record does not support that

he was aware of a potential risk or endangerment to R.S.-T.

Investigator Dickens testified that she attempted to contact Carla on several different occasions. She left several messages at the home of Ralph's parents. Additionally, during his testimony, Ralph acknowledged knowing that the Department was urgently looking for Carla and R.S.-T. and he did not contact the Department. The evidence supports several instances of domestic violence between Carla and Ralph occurred in the home and that Ralph was aware Carla was using drugs during her pregnancy.

■■■ The trial court could have reasonably believed some witnesses and discounted the testimony of others. *City of Keller*, 168 S.W.3d at 819. In doing so, the trial court could have formed a firm belief or conviction that Ralph was aware that the Department believed R.S.-T. was in a situation that was endangering his physical or emotional well-being and that Ralph was aware of the Department's concerns and failed to act to protect the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *J.F.C.*, 96 S.W.3d at 261.

*2. Texas Family Code Section 161.001(b)(1)(E)*

■■■ Subsection E permits termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, endanger means to expose the child to loss or injury or to jeopardize his emotional or physical well-being. *Id.*;

*Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The trial court must determine whether "evidence exists that the endangerment of the child's physical well-being was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.–M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied); *S.M.L.*, 171 S.W.3d at 477. "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *S.M.L.*, 171 S.W.3d at 477.

■■■■ Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after he was removed from a parent's care. *Walker*, 312 S.W.3d at 617. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct."); *Sylvia M. v. Dall. Cty. Child Welfare Unit*, 771 S.W.2d 198, 201, 204 (Tex. App.—Dallas 1989, no writ) (explaining courts consider "volatile and chaotic" marriage and repeated reconciliation with abusive spouse). "Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

■■■■ Ralph contends the record does not substantiate that he engaged in conduct that endangered R.S.-T.'s physical or emotional well-being. Investigator Dickens explained that Ralph was not in the original service plan because she had not yet made contact with the father. Ralph further asserts the only testimony concerning his interaction with the child was from his own testimony. We disagree.

The record contains testimony that Carla was using drugs during her pregnancy and Ralph was aware of her drug use. Both Carla and Ralph acknowledged the domestic violence; Investigator Dickens specifically testified regarding Ralph downplaying the Department's concerns. More specifically, during the pendency of the case, Department Program Director Cillie Anderson testified she was present when Carla arrived at the office with bruising and scratches to her neck. These photographs were marked and admitted during the termination hearing. When questioned by the Department, Ralph made light of the domestic abuse, explaining things simply "got out of hand."

The record is replete with testimony regarding different acts of abuse and neglect. Carla used drugs during her pregnancy with R.S.-T., and R.S.-T. was underweight based on a lack of caloric intake. Ralph testified his only responsibility was to provide the milk, not to ensure that R.S.-T. was being properly fed. Based on a review of the direct and circumstantial evidence contained in the record, we conclude the trial court could have formed a firm belief or conviction that Ralph engaged in conduct or knowingly placed R.S.-T. with Carla, an individual engaging in conduct which endangered R.S.-T.'s physical or emotional well-being. *See* Tex. Fam. Code

ANN. § 161.001(b)(1)(E); *J.L.*, 163 S.W.3d at 85.

### D. Trial Court's Termination of Ralph's Parental Rights based on Statutory Violations

██ We remain mindful that only one statutory ground is necessary to support a judgment in a parental-rights termination case. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.W.*, 494 S.W.3d 287, 291–92 (Tex. App.—Texarkana 2015, no pet.). Based on a review of the entire record, we conclude the evidence—legally and factually—supports the trial court's determination that Ralph failed to comply with his service plan pursuant to subsections D and E. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). We need not address Ralph's sufficiency challenges to subsection (O). *See id.* § 161.001(b)(1)(O); *A.V.*, 113 S.W.3d at 362.

Accordingly, we overrule Ralph's remaining issue on appeal.

### TERMINATION OF CARLA'S PARENTAL RIGHTS BASED ON CHILD'S BEST INTEREST

### A. Arguments of the Parties

In her sole issue on appeal, Carla contends that because the Department failed to make any reasonable accommodations to provide for her cognitive limitations in the services offered, the trial court erred in determining termination of Carla's parental rights was in R.S.-T.'s best interest.

### B. The *Holley* Factors

██ The trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (requiring appellate deference to the factfinder's findings); *City of Keller*, 168 S.W.3d at 819. Some factors used to ascertain the best interest of the child were set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *accord In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (reciting the *Holley* factors). The *Holley* Court warned that "[t]his listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Holley*, 544 S.W.2d at 372; *accord E.N.C.*, 384 S.W.3d at 807 (describing the *Holley* factors as nonexclusive). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). In fact, evidence of only one factor may be sufficient for a factfinder to reasonably form a firm belief or conviction that termination is in a child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *See id.*

In addition to consideration of the *Holley* factors, courts remain mindful that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016); *In re B.R.*, 456 S.W.3d 612, 615 (Tex. App.—San Antonio 2015, no pet.). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In determining whether a parent is willing and able to provide the child with a safe environment, courts should consider the following statutory factors set out in section 263.307(b) of the Code, which include the following:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills; ... and

(13) whether an adequate social support system consisting of an ex-

tended family and friends is available to the child.

Tex. Fam. Code Ann. § 263.307(b); *see In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *4 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.) (citing *In re A.S.*, No. 04-14-00505-CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem. op.)); *B.R.*, 456 S.W.3d at 616.

When determining the best interest of a child, a court "may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *B.R.*, 456 S.W.3d at 616 (citing *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)). A factfinder may also measure a parent's future conduct by his or her past conduct to aid in determining whether termination of the parent-child relationship is in the best interest of the child. *Id.* Finally, the grounds on which the trial court granted termination, pursuant to section 161.001 of the Code, "may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is *currently* in the child's best interest." *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (citation omitted).

*1. Desires of the Child*

R.S.-T. was only eighteen-months old at the termination hearing and did not testify. The evidence supports that R.S.-T. was happy and healthy and doing well in his foster parents' residence and they hoped to adopt R.S.-T. R.S.-T.'s foster mother testified R.S.-T. was bonding well with her family and his foster siblings. Additionally, Brittany Brumme, the Department's supervisor, testified R.S.-T. was doing well, was well fed, and was thriving in his current placement. No evidence indicates that R.S.-T. had any desire

to return to his mother's care. *See* TEX. FAM. CODE ANN. § 263.307(b)(13); *Holley*, 544 S.W.2d at 371–72; *see also C.H.*, 89 S.W.3d at 28 (holding placement plans and adoption evidence are relevant to best interest determination).

*2. Emotional and Physical Needs of the Child Now and in the Future and the Emotional and Physical Danger to the Child Now and in the Future*

Nothing in the record establishes that R.S.-T. has any special physical, emotional, or psychological needs. Although four attempts were undertaken, the Department denied placement in the home of R.S.-T.'s paternal grandfather on each occasion. The Department exhausted all of its options for family placement in this case.

▆▆▆▆. "The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). This court considers a parent's conduct before and after the Department's removal of the child. *See In re S.M.L.D.*, 150 S.W.3d 754, 757–58 (Tex. App.—Amarillo 2004, no pet.). The evidence indicates Carla knowingly placed or knowingly allowed R.S.-T. to remain in conditions or surroundings, which endangered the child's physical and emotional well-being and engaged in conduct that knowingly endangered R.S.-T.'s physical or emotional well-being. She tested positive for marijuana during her prenatal visits and acknowledged a physically violent relationship with Ralph. Additionally, despite the Department's efforts to ensure R.S.-T.'s physical needs were being cared for, including proper feeding and standard doctors' appointments, Carla refused to follow the guidelines or accept the assistance offered. The failure to provide appropriate medical care for a child is evidence a trial court may consider as conduct endangering the child. *See In re D.E.*, 761 S.W.2d 596, 600 (Tex. App.—Fort Worth 1988, no writ); *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 352–53 (Tex. App.—Austin 2000, no pet.) (considering parent's consistent failure to take advantage of many forms of assistance made available to her to help provide safe and stable living conditions for her children).

Alternatively, R.S.-T.'s foster mother testified that she has taken R.S.-T. to all of his appointments and cared for him. R.S.-T. was in a stable home with foster siblings, the only home he had known after leaving the hospital at seven-weeks old. R.S.-T. evidenced a strong bond with his foster family. His foster mother testified that she and her husband were hoping to adopt R.S.-T. *See O.N.H.*, 401 S.W.3d at 684 (concluding trial court permitted to consider parent's past conduct in best interest determination); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8), (11) (providing that, in determining best interest, courts may consider history of substance abuse by child's family or others who have access to the child's home); *Holley*, 544 S.W.2d at 371–72.

▆▆▆ A parent's mental illness or disability, without more, is not grounds for terminating the parent-child relationship. *Carter v. Dall. Cty. Child Welfare Unit*, 532 S.W.2d 140, 141–42 (Tex. Civ. App.—Dallas 1975, no writ); *accord In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied). "However, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can be considered in a termination proceeding." *C.M.B.*, 204 S.W.3d at 895 (citing *Carter*, 532 S.W.2d at 142); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ). Based on the evidence presented, the trial court could have formed a

firm belief or conviction that Carla was unable to provide a stable life or safe environment for R.S.-T.

### 3. Parenting Abilities and Services Available

The evidence suggests that Carla cared for R.S.-T. but was unable to provide the proper care or protection for R.S.-T. Carla's extensive drug use, including "anything [she] could get [her] hands on," predated the accident that caused Carla's brain injury. Her history of instability and her abusive relationship with Ralph outweigh her positive intentions. Carla's original service plan required her to live at her parents' residence. Investigator Dickens discussed the service plan with Carla and ensured that Carla understood the importance of accomplishing the tasks contained in the service plan. She listened as Carla discussed and explained the plan to her parents. Additionally, the Department provided a plethora of services for Carla. No less than four different witnesses testified they personally showed Carla how to measure and mix the formula. Yet, R.S.-T.'s condition required hospitalization for failure to thrive resulting from lack of caloric intake. Carla delayed any medical care for R.S.-T. and missed all standard medical appointments in the first six weeks of R.S.-T.'s life. Moreover, when questioned, it appeared Carla lied to the Department investigator about setting up a primary care physician and appointments for R.S.-T.

Dr. DeAnna Dance-Kwan explained the possible long-term effects of failure to thrive and the potential danger in which Carla's behavior placed R.S.-T. Carla understood the service plan prior to leaving the hospital following R.S.-T.'s birth. She knew that the service plan required her to live at her parents' residence. Still Carla decided to leave and move to San Marcos with Ralph. Multiple witnesses testified that Investigator Dickens contacted them regarding Carla's location and attempts to locate R.S.-T. For almost six weeks Carla failed to return the Department's calls or contact the Department or Investigator Dickens, in direct violation of the Department's safety plan. Her failure to follow through on the Department's service plan was potentially life threatening to R.S.-T.

Finally, the Department offered a multitude of services to Carla. Although Carla complains the Department delayed her neuropsychological evaluation, Brumme testified the services offered to Carla were the same type suggested in the completed evaluation, the providers and the caseworkers all understood that demonstration and repetition was important for Carla's understanding. Carla simply chose not to utilize the services and counseling offered by the Department. All of the experts agreed that, ultimately, it was Carla's failure to participate in counseling that prevented her from learning the skills needed to parent her child.

Accordingly, based on this evidence, the trial court could have formed a firm belief or conviction that Carla failed to work with the Department and did not fully comply with the terms of her service plan that were attainable. See J.L., 163 S.W.3d at 85; J.F.C., 96 S.W.3d at 261.

### 4. Stability of the Home or Proposed Placement

The record reflects Carla was living in Seguin with her parents at the time of the termination hearing. During the pendency of the case, Carla moved back and forth between Seguin and San Marcos. We further note a lack of testimony regarding familial assistance available for Carla. Although she lived with her parents, they were both disabled and neither testified during the termination hearing. See TEX.

FAM. CODE ANN. § 263.307(b)(13); *Holley*, 544 S.W.2d at 371–72.

■ "The goal of establishing a stable, permanent home for a child is a compelling interest of the government." *See Dupree*, 907 S.W.2d at 87. R.S.-T.'s foster mother testified that she and her husband wanted R.S.-T. to stay with them permanently and that they hoped to move forward with the adoption process. Additionally, the Department exhausted all of its options for placing R.S.-T. with Carla, Ralph, or their relatives. *See* TEX. FAM. CODE ANN. § 263.307(b)(10); *Holley*, 544 S.W.2d at 371–72.

### 5. *Any Excuse for the Acts or Omissions of the Parent*

■ A parent's " 'lack of education, training, or misfortune' " are properly considered under the *Holley* factors, but these factors do not negate all other evidence tending to show that termination is in the child's best interest. *See In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Carla contends the Department failed to provide her with the necessary evaluation and services to allow her to parent R.S.-T. Yet, the testimony clearly refutes this assertion.

Carla was ordered to comply with a service plan that was designed to provide her with the necessary assistance to enable her to provide R.S.-T. with a safe, stable, and nurturing environment. Although the service plan did not expressly include the neuropsychological evaluation or guidance, the Department applied the techniques suggested in the psychological evaluation. Carla, however, did not comply with the service plan. She did not follow the specific directions from several different individuals regarding how to mix a bottle of formula. If she was unsure, Carla did not turn to the sources available for her assistance. To the contrary, Carla left Seguin, moved to San Marcos, and appeared to have acted in a manner to avoid contact with Investigator Dickens. Carla failed to contact Investigator Dickens or return phone calls or messages left for her for almost six weeks. While Carla offers explanations of her need for very special care when learning new skills and the Department's lack of efficiency in obtaining a neuropsychological evaluation, none of these factors excuse Carla's failure to make efforts to become a suitable parent for R.S.-T. Carla was aware that R.S.-T.'s return was conditioned on her compliance with the service plan; yet, Carla elected not to complete the Department mandated services or to participate in the counseling services that could have directly aided Carla in learning the necessary skills.

Although Carla's mental disability clearly played a part in her inability to properly care for R.S.-T. immediately after his release from the hospital, the Department was adamant this was not the reason for requesting termination. Many of Carla's issues were separate and distinct from her mental impairment. Carla's extensive drug use and abusive relationship with Ralph both existed long before her head injury. Carla refused to utilize the available services, even in light of the Department's delay in obtaining the neuropsychological evaluation.

### C. Trial Court's Determination That Termination of Carla's Parental Rights Was in R.S.-T.'s Best Interest

The trial court found, and Carla does not challenge on appeal, that Carla

knowingly placed or knowingly allowed [R.S.-T.] to remain in conditions or surroundings which endanger [R.S.-T.'s] physical or emotional well-being . . .; engaged in conduct or knowingly placed [R.S.-T.] with persons who engaged in

conduct which endanger [R.S.-T's] physical or emotional well-being ...; [and] failed to comply with the provisions of a court order[ed service plan]....

See Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), and (O). The trial court's determination regarding Carla's termination under section 161.001(b)(1) is properly considered in its findings that termination is in the best interest of the child and is, in fact, probative in determining the child's best interest. See C.H., 89 S.W.3d at 28 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest); O.N.H., 401 S.W.3d at 684.

On appeal, Carla focuses much attention on the Department's failure to timely obtain a neuropsychological evaluation and the Department's failure to incorporate necessary accommodations to allow Carla to comprehend, understand, and benefit from the providers' services. There is little question the Department had great difficulty scheduling the neuropsychological evaluation and there was an extensive delay in obtaining this evaluation. Nevertheless, the testimony also supports that the recommendations from the neuropsychological evaluation and the psychological evaluation pertaining to Carla's ability to learn were similar—individuals with intellectual limitations require repetition in the learning process and the psychological evaluation suggestions were followed by the Department. In fact, Jane Tomlinson, the Department's counselor, opined that Carla was unsuccessful because of Carla's failure to attend the counseling sessions with any regularity, not because of any failure by the Department to provide accommodations. Although the formal service plan itself was not altered or modified following Carla's psychological evaluation, the Department supervisor and the caseworkers all testified to working with Carla,

in a one-on-one capacity, and their understanding of the importance of repetition and demonstration.

Several people also testified to working with Carla, one-on-one, in an attempt to guide her in both feeding R.S.-T. and learning the necessary parenting skills. The foster parents even allowed Carla and Ralph to visit R.S-T. in their home to provide Carla additional assistance. Yet, Carla chose not to attend several of the scheduled visits with R.S.-T. or to participate in other services offered by the Department, specifically the counseling sessions. The trial court could have reasonably determined that Carla's failure to attend the counseling sessions was a greater impediment to her learning the necessary skills than whether the counselor was using the specific techniques specified by the neuropsychological evaluation.

We remain mindful that the trial court is the sole judge of the weight and credibility of the witnesses. Here, the trial court heard from numerous witnesses and also reviewed several reports filed with the court during the pendency of the case. In making its determination, the trial court is called upon to determine R.S.-T.'s best interest; above all, the court must consider the child's placement in a safe environment. See Tex. Fam. Code Ann. § 263.307(a); B.R., 456 S.W.3d at 615. The Department's emergency removal, eighteen months before the termination hearing, was based on Carla's failure to follow the safety plan and the resulting physical harm suffered by R.S.-T. The Department designed the safety plan to promote reunification. Yet, at each step along the way, Carla chose not to take the necessary steps to ensure that she could safely parent R.S.-T. Among other things, Carla chose to use drugs on at least two occasions during her pregnancy, Carla chose to violate the original service plan by leaving

her parents' residence with newborn R.S.-T., Carla chose not to take newborn R.S.-T. for standard and necessary medical follow-up appointments, Carla chose not to attend the parenting or domestic abuse classes, Carla chose not to attend many of the scheduled visitations with R.S.-T., and Carla chose not to participate in the court-ordered individual therapy sessions offered by the Department.

Reviewing the evidence under the two sufficiency standards, and giving due consideration to evidence that the trial court could have reasonably found to be clear and convincing, we conclude the trial court could have formed a firm belief or conviction that terminating Carla's parental rights to R.S.-T. was in R.S.-T.'s best interest. *See J.L.*, 163 S.W.3d at 85; *J.F.C.*, 96 S.W.3d at 266; *see also H.R.M.*, 209 S.W.3d at 108. Therefore, the evidence is legally and factually sufficient to support the trial court's order terminating Carla's parental rights. *See J.F.C.*, 96 S.W.3d at 266; *see also H.R.M.*, 209 S.W.3d at 108.

## CONCLUSION

The trial court found Ralph committed three statutory grounds supporting termination of his parental rights and that termination of his parental rights was in R.S.-T.'s best interest; he does not appeal the trial court's best interest determination. Having concluded that Texas Family Code section 201.015 provides the trial court with the authority to consider the record of the hearing before the associate judge, TEX. FAM. CODE ANN. § 201.015(c), and that the evidence legally and factually supports the trial court's determination that Ralph failed to comply with his service plan pursuant to subsections (D) and (E), *id.* § 161.001(b)(1)(D), (E), we overrule Ralph's issues on appeal and affirm the trial court's order terminating Ralph's parental rights.

The trial court further found Carla committed the statutory grounds supporting termination of her parental rights and that termination of Carla's parental rights was in R.S.-T.'s best interest. Carla only appealed the best interest of the child finding. Having reviewed the evidence, we conclude the evidence was legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of Carla's parental rights to R.S.-T. was in the child's best interest. Accordingly, we overrule Carla's sole issue on appeal and affirm the trial court's order terminating Carla's parental rights.