# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00476-CV

### S. B., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 324123, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

S.B. (Mother) appeals the district court's final decree terminating her parental rights to her three children—daughter A.B., born in 2008; daughter A.C., born in 2019; and son M.C., born in 2020.[1] In three issues, Mother asserts that the court abused its discretion in denying her motion for a continuance and that the evidence is legally and factually insufficient to support the trial court's findings that statutory grounds for termination exist, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), and that termination of her parental rights is in the children's best interest, *see id.* § 161.001(b)(2). For the reasons that follow, we affirm the district court's decree.

---

[1] The decree also terminated the parental rights of A.C.'s and M.C.'s father (Father), who did not file a notice of appeal and therefore is not a party to these proceedings. A.B.'s biological father died prior to the relevant underlying events.

**BACKGROUND**

On January 7, 2021, the Texas Department of Family and Protective Services received a report that Mother went to the hospital complaining of nasal congestion and a headache but that, while there, she expressed to hospital staff that she was having suicidal and homicidal ideations towards Father and her then-fourteen-year-old daughter, A.B. The report also informed the Department that Mother tested positive for cocaine at the hospital. The next day, the Department received a report of recent physical abuse by Mother in the family's home. The report alleged that on January 6, 2021, Mother became upset when she tripped on a heater and then pushed her two-year-old daughter, A.C. The push by Mother allegedly caused A.C. to hit her head on an entertainment center, and the child sustained a large mark on the side of her head and a cut to her ear. The Department received a third report on February 26, 2021, stating that during an argument with A.B., Mother pulled A.B.'s hair and hit her in the face with a skillet.

On April 15, 2021, the Department filed an original petition, seeking to be appointed managing conservator of the children or, if reunification cannot be achieved, to terminate the parent-child relationship between Mother and her children. The Department also requested emergency orders allowing for the immediate removal of the children and, in support of its request for removal, attached to its petition an affidavit by the Department investigator assigned to the case. That same day, the district court signed an order granting the request for removal and appointed the Department as the children's temporary managing conservator.

According to the removal affidavit, on January 8, 2021, the Department investigator met with a family friend who was present at the home during the January 6 incident. The friend told the investigator that on that day, Mother came home intoxicated and "appeared to

be under the influence of cocaine." The friend and Father were having a conversation in the kitchen when Mother, who was holding M.C., "threw [M.C.] on the bed" and then interrupted their conversation. Mother then lost her balance, fell, and upon getting up, pushed A.C. into the entertainment center. The friend also reported that his girlfriend had given money to Mother to pay the family's water bill, but Mother used some of the money to buy cocaine and alcohol. The friend admitted, however, that he had never seen Mother use cocaine.

In her removal affidavit, the Department investigator also summarized interviews that she conducted with A.B. During these interviews, A.B. described several violent incidents involving Mother. As to the January 6 incident, A.B. told the investigator that "her mom threw [M.C.] on the bed," "got up and lost her balance and fell into the heater," and "pushed [A.C.] into the TV stand." She also described to the investigator an incident in which Mother told A.B. to pick up a suitcase that she had accidentally knocked down from the closet and then "held her down in the closet by her neck." According to A.B., Mother let go of A.B. when she began to cry, but when A.B. accidentally tripped Mother with the suitcase as she got up, Mother "held her down and punched and slapped her several times." Finally, A.B. told the investigator about an incident that occurred the month before, in which she and Mother were arguing about whether A.B. could wear pajama pants. According to A.B., Mother was accidentally hit by a skillet as she attempted to grab the skillet out of A.B.'s hand. A.B. told the investigator that Mother responded by "pull[ing] her head down on the table while hitting her in the face" and "pulling her hair." When A.B. started screaming, Father came and pulled Mother off of her. A.B. also reported to the investigator that the day before, she had seen Mother with "two weeds blunts and a tube with white powder in it."

Finally, the Department investigator summarized conversations that she had with Father and Mother. According to the removal affidavit, when the investigator met with Father at the family residence, he reported that he and the family had been without water for about two weeks and that the water was turned off because Mother was supposed to pay the water bill but only paid eighty dollars towards the bill. Father also told the investigator that he believed Mother used the rest of the money to buy cocaine and alcohol. Father also corroborated A.B.'s and the family friend's accounts of the January 6 incident.

During the investigator's interview with Mother, Mother denied ever hitting A.B. and stated that she only pulled A.B.'s hair after A.B. hit her first with a frying skillet and pulled her hair. Mother also denied that she was using drugs, stated that the last time she used cocaine was in 2013, and agreed to the investigator's request to take a hair-follicle drug test. The agreed-to drug test was administered on March 1, 2021, and the results were positive for cocaine. Mother subsequently admitted to the investigator that she had used cocaine two weeks before taking the drug test.

On March 10 and April 14, 2022, an associate judge conducted a final hearing on the Department's petition at which the judge heard testimony from the Department caseworker, Mother, and Father. *See* Tex. Fam. Code § 201.201 (appointment of associate judges in child-protection cases). In addition, the associate judge admitted into evidence the removal affidavit, the results of the drug tests submitted by Mother before and during the pendency of the suit, the written report from her psychological evaluation, and her court-ordered family service plan. At the conclusion of the hearing, the associate judge found that grounds for termination exist and that termination of Mother's parental rights is in the children's best interest.

4

At the de novo hearing that followed the associate judge's ruling, the district court admitted into evidence the entire record from the hearing before the associate judge. *See id.* § 201.015 ("De Novo Hearing Before Referring Court"). The district court heard additional testimony from Father and from two character witnesses in support of Father's assertion that he was capable of caring for his children and that termination of his parental rights was not in his children's best interest. *Id.* § 201.015(c) ("In the de novo hearing before the referring court, the parties may present witnesses on the issues specified in the request for hearing."). At the conclusion of the de novo hearing, the district court signed a decree terminating Mother's parental rights on the same grounds as the associate judge. This appeal followed.

## STANDARD OF REVIEW

"While parental rights are of constitutional magnitude, they are not absolute." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). To terminate a parent-child relationship, the Department must prove by clear and convincing evidence that (1) the parent's acts or omissions constitute at least one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b)(1), (2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In an appeal from an order terminating parental rights, we apply a standard of review that reflects this heightened standard of proof. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.

5

2002). In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to the finding may be considered." *In re A.C.*, 560 S.W.3d at 630. When evaluating the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the finding and consider any undisputed contrary evidence to decide whether "a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. A factual-sufficiency review, in contrast, "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## ANALYSIS

### *Denial of Motion for Continuance and Extension*

In her first issue, Mother contends that the trial court abused its discretion in denying her motion for a continuance and extension of the automatic dismissal date under Section 263.401(b) of the Family Code.

Section 263.401 provides an automatic dismissal in cases where the Department requests termination of parental rights or permanent conservatorship on the first Monday after the anniversary date of the Department's appointment as temporary managing conservator unless the court has commenced trial on the merits or granted an extension. Tex. Fam. Code § 263.401(a). To grant an extension, the trial court must find "that extraordinary circumstances necessitate the child remaining in the temporary conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best

6

interest of the child." *Id*. § 263.401(b). We review a trial court's decision to grant or deny a request for an extension under Section 263.401(b) for an abuse of discretion. *D.J. v. Texas Dep't of Fam. & Protective Servs*., No. 03-20-00454-CV, 2021 Tex. App. LEXIS 1565, at \*24 (Tex. App.—Austin Mar. 3, 2021, no pet.) (mem. op.).

The day before the final hearing, which commenced on March 10, 2022, Mother filed a motion requesting that the trial court grant a continuance and extend the automatic dismissal date for an additional six months. Mother made the request on the ground that, in her view, she had made a good-faith effort to complete her court-ordered services but needed additional time to fully comply. In support of her motion, Mother testified that she moved to Michigan on December 17, 2021, and that, as a result, she now had to pay for required services, such as drug testing and counseling. Mother further explained that she could not currently afford to pay for these services and that she was trying to contact the Department of Social Services in Michigan to see if she could get help. On cross-examination, however, Mother admitted that she had moved to Michigan without the court's approval and knowing that her parental rights could be terminated if she failed to complete the court-ordered services that were being provided free of charge in Texas. In addition, Mother acknowledged that she moved to Michigan without having a job there and that she still did not have housing. Moreover, since moving, she had seen her children only one time, by Zoom.

"Actions that are considered to be the parent's fault will generally not constitute extraordinary circumstances" that merit an extension under Section 263.401(b) *In re J.S.S.*, 594 S.W.3d 493, 14 (Tex. App.—Waco 2019, pet. denied). Therefore, "[w]hen a parent, through [his or] her own choices, fails to comply with a service plan and then requests an extension of the statutory dismissal date in order to complete the plan, the trial court does not abuse its discretion

7

by denying the extension." *In re Y.G.*, No. 01-22-00181-CV, 2022 Tex. App. LEXIS 5917, at *26-27 (Tex. App.—Houston [1st Dist.] Aug.16, 2022, no pet.) (mem. op.) (quoting *In re A.P.*, No. 10-22-00008-CV, 2022 Tex. App. LEXIS 2968, at *14 (Tex. App.—Waco May 4, 2022, no pet.) (mem. op.)). Based on the evidence before it, the associate judge could have reasonably determined that Mother waited too long to begin trying to comply with her service plan and that any impediment to her completing her services was a result of her own decision to move outside of Texas. Consequently, we cannot conclude that the trial court abused its discretion in denying Mother's motion for a continuance and extension. We overrule Mother's first issue.

*Statutory Findings*

Next, we consider Mother's third issue on appeal, in which she challenges the legal and factual sufficiency of the evidence supporting the district court's findings as to each statutory ground alleged by the Department—namely, subsections (D), (E), and (O) of Section 161.001(b)(1). We will begin by analyzing whether the evidence is sufficient to support that district court's finding of endangerment under subsection (E).

A trial court may order termination of the parent-child relationship under subsection (E) if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code. § 161.001(b)(1)(E). When evaluating the evidence with respect to subsection (E), the relevant inquiry is whether the child's physical or emotional well-being was endangered as a direct result of the parent's conduct, including acts and omissions or failures to act. *A.S. v. Texas Dep't of Fam. & Protective Servs.*,

8

394 S.W.3d 703, 711 (Tex. App.—El Paso 2012, no pet.); *see V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Termination under subsection (E) requires more than a single act or omission, and the Department must show a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home." *T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 Tex. App. LEXIS 8226, at *19-20 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.).

A child is "endangered" if the child is exposed to loss or injury or if the child's emotional or physical health is jeopardized. *D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.); *A.S.*, 394 S.W.3d at 711. Although endangerment means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), it is not necessary to show that the conduct was directed at the child or that the child actually suffered injury, *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Moreover, endangerment does not have to be established as an independent proposition but may instead be inferred from the parental misconduct alone. *A.C. v. Texas Dep't of Fam. & Protective Servs*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (citing *Boyd*, 727 S.W.2d at 533).

Although not automatic, a parent's illegal drug use and its effect on her ability to parent may qualify as an endangering course of conduct under subsection (E). *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *A.C.*, 577 S.W.3d at 699; *see D.H.*, 652 S.W.3d at 61 ("[I]n some circumstances, a parent's drug use might be so pervasive or serious that the factfinder could reasonably infer that the drug use is endangering, despite a lack of evidence showing that

9

the drug use caused some other endangering activity or even that the drug use occurred while the children were in the parent's direct care."). When a parent fails to attend a scheduled drug test, the factfinder may reasonably infer that the parent was avoiding the test because she was using drugs. *S.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00695-CV, 2022 Tex. App. LEXIS 4662, at \*35 (Tex. App.—Austin July 8, 2022, pet. denied) (mem. op.) (citing *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.)). Similarly, evidence of domestic violence may support a finding of endangerment under subsection (E), even if the violence is not directed toward the child. *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.— San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.").

In this case, the undisputed evidence presented at the final hearing establishes that when the children were removed from Mother's care on April 15, 2021, she had been using cocaine and engaging in physical violence. The removal affidavit, as previously discussed, shows that Mother engaged in violent conduct on at least three separate occasions, including on January 6, 2021, when she pushed A.C. and caused an injury to the child's head, and on February 26, 2021, when she pulled A.B.'s hair. In addition, Father and his friend reported that at the time of the January 6 incident, Mother appeared to be intoxicated, and they suspected that she was under the influence of cocaine. The next day, and then on March 1, 2021, Mother tested positive for cocaine. Later, in her court-ordered psychological evaluation, Mother (then thirty-one years old) reported that she first used cocaine when she was twenty-three and that she had used cocaine intermittently for several years but had not used it since she was thirty.

10

The evidence presented at the final hearing also shows that Mother continued to use cocaine after the children were removed from her care. *See D.H.,* 652 S.W.3d at 62 (explaining that evidence of "parent's decision to use drugs while the termination suit is pending, and the parent is at risk of losing her child, may support a finding of endangering conduct under subsection (E)"). Mother's service plan, in part, required her to submit to drug tests on a weekly basis, and the results of those tests show that she tested positive for cocaine in March 2021, April 2021, August 2021, and September 2021. In addition, the Department caseworker testified that while the case was pending, Mother moved to Michigan, telling the caseworker that she had moved because "she was in a bad relationship with [Father] and she needed to get out." The caseworker further testified that when she learned that Mother was moving to Michigan, she informed Mother that the Department could not pay for services in Michigan, including required drug tests; that Mother would have to pay for services in Michigan "out of pocket"; and that Mother last tested negative on December 9, 2021, and had not submitted to any additional drug test since. In addition, the caseworker stated that even before she moved to Michigan, Mother failed to show for some of her scheduled drug tests.

During her testimony, Mother testified that she was capable of caring for the physical and emotional needs of her children. Mother did not dispute, however, that in the past she had used drugs or engaged in violent conduct. Instead, Mother testified that she was no longer using drugs, that she had not used drugs "since the last hearing," and that she was trying to save money so that she could submit another drug test.

After viewing all the evidence in the light most favorable to the district court's finding and considering any evidence contrary to the district court's findings, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother engaged in a

course of conduct that endangered her children's physical or emotional well-being. *See In re A.C.*, 560 S.W.3d at 631. In addition, in light of the entire record, we conclude that the disputed evidence is not so significant that the district court, as factfinder, could not have formed a firm belief or conviction that Mother engaged in a course of conduct endangering to her children. *See id.* Because the evidence is legally and factually sufficient to support the district court's endangerment finding under subsection (E), we need not consider whether the evidence also supports the court's findings under subsection (D) or (O). *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) ("To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground."). We overrule Mother's third issue on appeal.

### *Best-Interest Finding*

Finally, we consider Mother's argument that the evidence is legally and factually insufficient to support the district court's best-interest finding. *See* Tex. Fam. Code § 161.001(b)(2). A determination of whether termination is in the best interest of a child "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). To determine whether termination is in a child's best interest we consider the non-exhaustive factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), including: (1) the children's wishes; (2) the children's present and future emotional and physical needs; (3) any emotional and physical danger to the children, now and in

12

the future; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist these individuals in promoting the best interest of the children; (6) the plans for the children by the individual or agency seeking custody; (7) the stability of the proposed home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. The Department is not required to prove all of these factors, and the absence of evidence of some of these factors does not preclude a finding that termination is in the children's best interest. *C.H.*, 89 S.W.3d at 27. Thus, while proof concerning the statutory predicate under section 161.001(b)(1) does not relieve the Department of proving that termination is in the best interest of the children, the "same evidence may be probative of both issues." *V.P.*, 2020 Tex. App. LEXIS 938, at *23 (quoting *In re C.H.*, 89 S.W.3d at 28). Evidence of drug use is especially relevant in accessing parenting abilities and whether the parent's acts or omissions indicate that the existing parent-child relationship is not appropriate. *In re T.N.J.J.*, No. 04-19-00228-CV, 2019 Tex. App. LEXIS 10319, at *15 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.).

As previously discussed, the Department presented evidence concerning Mother's drug use, both prior to and after the children's removal, and her history of child abuse. In addition, the Department presented evidence suggesting that Mother suffers from untreated mental health issues that could negatively affect her ability to meet the physical and emotional needs of the children. During her psychological evaluation, Mother reported receiving inpatient therapy in 2015 and 2021 after experiencing suicidal and homicidal thoughts, and she admitted to having attempted suicide three separate times. Mother told the psychologist that in 2021, she "began to walk in the direction of a highway but decided to check herself into a hospital instead."

13

Moreover, according to the removal affidavit, the investigation underlying this case was initiated when the Department received a report in January 2021 that Mother had told hospital staff that she was having "suicidal ideations and homicidal ideations." Despite her psychiatric history, and although her service plan required her to complete counseling, the Department caseworker testified that at the time of the final hearing, she had not completed her counseling or a parenting class.

The trial court also heard about Mother's plans for the children should they be returned to her care. Mother stated that she had family in Michigan that could help with babysitting, that she has been employed at Taco Bell for the last month and a half, and that she wanted to maintain a relationship with her children. Mother testified that although she does not currently have appropriate housing and is living with a friend, she has applied for subsidized housing and that if the children were returned to her, they could go to a family shelter until her subsidized-housing arrangement was finalized. Finally, Mother testified that she believes that she is capable of caring for the physical and emotional needs of the children but that, alternatively, she would like to maintain a relationship with them in the future.

Finally, the trial court also heard evidence about the Department's plans for placement of the children. As to A.B., the caseworker testified that A.B. is currently in a group foster home and that the Department believes it is in A.B.'s best interest if someone other than Mother made decisions for A.B. The caseworker stated that the Department is still looking for a relative or fictive kin placement for conservatorship and is considering placing A.B. with a family friend in Michigan, whom Mother agreed would be a good placement. As to A.C. and M.C., the caseworker testified that the children are residing with foster parents (one of whom is

14

their paternal half-brother), that they have bonded with their foster parents, and that the foster parents hope to adopt both children.

Applying the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the district court's finding that it was in the children's best interest to terminate Mother's parental rights. We overrule Mother's third appellate issue.

## CONCLUSION

Having overruled Mother's issues on appeal, we affirm the district court's decree of termination.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed: January 26, 2023

15