**Opinion filed March 30, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00257-CV

_____

## IN THE INTEREST OF R.M., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 10669-CX**

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of the mother of R.M. *See* TEX. FAM. CODE ANN. § 161.001 (West 2022). The mother filed a notice of appeal. In five issues on appeal, she challenges the sufficiency of the evidence in support of termination. We affirm.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. §§ 161.001(b), 161.206(a). To terminate one's parental rights under Section 161.001, it must be shown by clear and convincing evidence that the parent

has committed one of the acts listed in Section 161.001(b)(1)(A)–(U) and that termination is in the best interest of the child. *Id.*

In this case, the jury found that the mother had committed three of the acts listed in Section 161.001(b)(1)—those found in subsections (D), (E), and (O)—and the trial court granted summary judgment based upon subsection (M). Specifically, the findings were (1) that the mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being, (2) that the mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being, (3) that the mother had had her parental rights terminated with respect to another child based on a finding under subsection (D) or (E), and (4) that the mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child, who had been in the managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parents for abuse or neglect. *See id.* § 161.001(b)(1)(D), (E), (M), (O). The jury also found that termination of the mother's parental rights would be in the best interest of the child. *See id.* § 161.001(b)(2).

To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We note that the factfinder is the sole

arbiter of the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

*Procedural and Factual Background*

At the time of the first intake on March 18, 2021, R.M. was eleven months old. There were concerns for physical neglect and neglectful supervision because of developmental delays and her being underweight. Several days later, there was a second intake based on a report that R.M. had a broken arm, raising a suspicion of physical abuse. The Department found that the explanation given by the mother for R.M.'s broken arm was inconsistent with R.M.'s injury. It was later revealed by the mother that R.M.'s injury was caused by her stepfather,[1] and it was also discovered

---

[1]During the investigation, it was discovered that R.M.'s biological father was deceased.

3

that he was responsible for a bruise on her face around the same time. After initially giving two different explanations that indicated R.M. injured herself, the stepfather eventually admitted that he caused the injury to R.M.'s arm. The stepfather told police that he "applied a chicken wing" where he forcibly put R.M.'s "arm behind her back and applied force." The reason given by the stepfather was that he was frustrated because R.M. had been crying and he was alone with her, and that he was only trying to play with R.M. The mother also told the Department's visitation supervisor that the stepfather only put R.M.'s arm behind her back because he was trying to calm her down. The visitation supervisor explained that this was harmful rather than calming, and the stepfather said he did not know at the time that it would hurt R.M. but that he knew now and would not repeat the actions. Despite this, the mother informed the Department's investigator that the stepfather hurts R.M. when the mother leaves R.M. alone with him, and the Department's concern was that this was a pattern of harmful behavior toward R.M.

In addition to her broken arm and bruised face, R.M. showed signs of neglect. There were concerns that R.M. was underweight and was behind developmentally. Before R.M. was removed from the mother and stepfather's care, she had been referred to Early Childhood Intervention (ECI) because, at six months old, she was not yet rolling over. Despite the referral, at the time of the intake, R.M. had not received any ECI services and she was not yet able to sit up on her own.

The Department's investigator testified that one of the Department's concerns about the mother was that she gets overwhelmed with multiple children. The mother's actions, and inactions, are likely explained by her intellectual disabilities. The mother has been a client of the Betty Hardwick Center for years. Psychological testing revealed that she has a mild intellectual disability and an autism spectrum disorder. The mother's adaptive assessment score was 65 in 2017, but by 2021, that score had risen to 87. The adaptive assessment measures communication, daily

4

living skills, and social skills. The score of 65 placed the mother at a "moderate level of deficit," and the score of 87 showed an improvement to a "mild level of deficit." The Betty Hardwick employee who testified at trial indicated that she was certified by the Health and Human Services Commission to make determinations of intellectual disability for state services, but that the assessment did not measure parenting skills and she had never seen the mother with a child and had no knowledge of her parenting abilities.

The visitation supervisor had ample opportunities to see the mother's parenting abilities. The visitation supervisor testified that she had concerns that neither the mother nor the stepfather could care for the children[2] alone. There was also a concern that the mother would not be able to meet the basic needs of the children—or may not be able to do so in an appropriate time—and that she did not always know how to interact appropriately with the children based upon the developmental age of the children. Additionally, the stepfather had to be told by the mother, the visitation supervisor, or his own stepfather to care for the children, and never took initiative himself to care for them during the visits. Although the visitation supervisor testified that the mother and stepfather made "really good progress," she expressed a continued concern that the mother lacked the understanding to be able to care for multiple children at the same time. The supervisor believed that the mother and stepfather would need someone who could live with them to help as the children grew up, and that the mother and stepfather would need to be constantly learning from a professional or therapist.

---

[2]When the testimony refers to "the children," it refers to R.M. and her half-brother, L.M. At the time of the investigation, R.M. was living with the mother and stepfather, and their biological child, L.M. The mother's and the stepfather's parental rights to L.M. were previously terminated by the trial court, and that decision was affirmed by this court on September 22, 2022. *See In re L.M.*, No. 11-22-00079-CV, 2022 WL 4371099 (Tex. App.—Eastland Sept. 22, 2022, no pet.) (mem. op.). At the time of the termination hearing as to R.M., the mother and stepfather had another child, D.M.

The mother completed the services required of her by the service plan and was trying to do what was needed to have R.M. returned to her care. Despite the completion of that service plan and the mother making progress in her parenting skills, the Department determined that the improvement was not substantial enough to recommend reunification. The stepfather had not made the same progress with his parenting skills, and the mother was not open to separating from the stepfather. The Department also had concerns that the stepfather's stepfather—who was living with the mother and stepfather at the time of the hearing—could not provide the required support to allow R.M. to be returned to the mother's care.[3]

After R.M. was removed from her mother's care, she was placed in foster care and has thrived in the care of the foster parents. The Department's goal for R.M. was termination and adoption by R.M.'s foster parents. The placement has allowed R.M. to live with her half-brother L.M. and their older half-sister (who had lived with these same foster parents for four years). The permanency case manager for 2INgage believed that the Department's goal for R.M. was in R.M.'s best interest. She testified that the foster parents had maintained a relationship with the mother during the placement of the older half-sister and had continued to encourage a relationship between that child and the mother. The foster parents indicated that they would do the same for R.M.

*Analysis*

*Endangering Conduct*

In the mother's first and second issues, she challenges the findings made by the jury under Section 161.001(b)(1)(D) and (E). We must address a parent's challenge to findings that were made pursuant to subsection (D) or (E). *See In re*

---

[3]We note that the mother delivered a baby boy, D.M., prior to the termination hearing that is at issue in this appeal. The testimony showed that this baby was released from the hospital in the care of the parents—with whom the father's stepfather was living to help them care for their children—and that, following a complaint and investigation, the Department had no concerns for the safety of D.M.

*N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (addressing due process and due course of law with respect to appellate review of grounds (D) and (E) and holding that an appellate court must provide a detailed analysis if affirming the termination on either of these grounds); *see also In re B.H.*, No. 01-21-00390-CV, 2021 WL 6067717, at *3 (Tex. App.—Houston [1st Dist.] Dec. 23, 2021, pet. denied) (mem. op.) (explaining that, because of the recent addition of Section 161.001(d-1) to the statute and (d-1)'s time limitation for termination on ground (M), ground (E) must be analyzed on appeal—pursuant to *N.G.*—even though ground (M) was satisfied by proof of a prior termination that was based upon ground (E)).

Under subsection (D), termination is permitted when the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Fam. § 161.001(b)(1)(D). Subsection (D) focuses on the child's environment. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). The relevant time frame for evaluating this ground is before the removal of the child, during a monitored return, or perhaps during unsupervised visitation, as the endangering conditions must be experienced by the child, not anticipated. *See id.* at 749 & n.12. "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry." *Id.* at 749 (citing *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.)).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 34 (Tex. App.—Eastland 2011, no pet.). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228

(Tex. App.—Eastland 1999, no pet.). The offending conduct need not be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). With respect to the sufficiency of the evidence to support a finding under subsection (E), "endangering conduct is not limited to actions directed towards the child." *Id.* (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The endangering conduct may include the parent's actions before the child's birth and may relate to the parent's actions while the parent had custody of other children. *Id.*; *In re S.T.*, No. 11-19-00363-CV, 2020 WL 2610393, at *3–4 (Tex. App.—Eastland May 18, 2020, pet. denied) (mem. op.) (upholding finding under subsection (E) based upon parent's conduct with other children). Additionally, domestic violence may constitute evidence of endangerment. *C.J.O.*, 325 S.W.3d at 265.

The evidence presented at trial supports the finding under subsection (E). The record shows that the stepfather fractured R.M.'s arm when she was eleven months old and that the mother was aware that the stepfather hurt R.M. when the stepfather was left alone with the child—yet she left the stepfather alone with R.M. anyway. The record also shows that R.M., while in the care of the mother and the stepfather, was underfed and failed to thrive. Based upon the evidence presented at trial regarding the mother's conduct and care of R.M., the jury could have reasonably found by clear and convincing evidence that the mother engaged in a course of conduct that endangered R.M. Therefore, we hold that the evidence is legally and factually sufficient to uphold the finding under subsection (E). Accordingly, we overrule the mother's first and second issues.[4] Because only one statutory ground is necessary to support termination and because we have upheld the finding as to

---

[4]The mother combines the first and second issues—as to subsections (D) and (E)—for all purposes. Therefore, as they are presented and argued together, we overrule both issues but address only subsection (E).

subsection (E), we need not address the mother's argument under subsection (D) or the mother's third and fourth issues. *See* FAM. § 161.001(b)(1); *N.G.*, 577 S.W.3d at 234–35; *see also* TEX. R. APP. P. 47.1.

*Best Interest*

In the mother's fifth issue, she challenges the sufficiency of the evidence to support the finding that termination of her parental rights would be in the best interest of R.M.

With respect to R.M.'s best interest, the evidence set forth above shows that, despite the Department's efforts to assist the mother to appropriately parent multiple children, her intellectual disabilities prohibited her ability to make progress at a rate comparable to R.M.'s own development. The stepfather physically harmed eleven-month-old R.M., fracturing her arm because she was crying, and the mother admitted she knew that the stepfather had a pattern of hitting R.M. in an attempt to make her stop crying. The mother additionally was unwilling to leave the relationship with the stepfather. Clear and convincing evidence showed that placing R.M. in a home with the mother and stepfather created a risk of danger to her safety. The mother and stepfather also had another child together while this case was pending. Testimony showed that the parents were not capable of parenting multiple children without additional supervision or assistance, and the Department did not feel confident with the support provided by the stepfather's stepfather. At the time of the termination hearing, R.M. was thriving in the care of her foster parents, and all her needs were being met. Furthermore, the permanency case manager testified that it would be in R.M.'s best interest to terminate the parental rights of the mother.

The jury, as the factfinder, is the sole judge of the witnesses' credibility. *A.B.*, 437 S.W.3d at 503. In light of the deference to be given the jury in this regard, the evidence presented at trial, and the *Holley* factors, we conclude that the jury could reasonably have formed a firm belief or conviction that termination of the mother's

9

parental rights would be in R.M.'s best interest. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of those involved, the plans for the child by the Department, the intellectual disabilities of the mother, and the injury suffered by R.M. while in the care of the mother and the stepfather, we hold that the evidence is legally and factually sufficient to support the jury's finding that termination of the mother's parental rights is in the best interest of R.M. *See id.* We defer to the jury's findings as to the child's best interest, *see C.H.*, 89 S.W.3d at 27, and we cannot hold in this case that the jury's findings as to best interest are not supported by clear and convincing evidence. Accordingly, we overrule the mother's fifth issue.

*This Court's Ruling*

We affirm the trial court's order of termination.


W. BRUCE WILLIAMS

JUSTICE


March 30, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.