

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00681-CV

In the Interest of **E.G.K.**, a Child

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-01021
Honorable Kimberly Burley, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:          Patricia O. Alvarez, Justice
                 Irene Rios, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: April 5, 2023

AFFIRMED

Appellant K.N.E. ("Mother") appeals the trial court's judgment terminating her parental rights to her daughter, E.G.K. ("the child").[1] [2] On appeal, Mother argues the evidence is legally and factually insufficient to support the trial court's predicate findings under subsections (O) and (D) and its best interest finding. Because we conclude the evidence is legally and factually sufficient to support each of the challenged findings, we affirm.

---

[1]To protect the identity of the minor child, we refer to the parties and the child by their initials. *See* TEX. FAM. CODE. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

[2]The trial court's judgment also terminated the parental rights of the child's alleged father, J.K. He did not appeal.

## BACKGROUND

On June 14, 2021, the Texas Department of Family and Protective Services filed an original petition seeking protection and conservatorship of E.G.K. and termination of Mother's parental rights. On the same day, the trial court signed an emergency order authorizing E.G.K.'s removal from Mother's home. E.G.K., who was only two months old at the time of removal, was placed with her paternal grandparents, where she remained until the time of trial.

The trial court conducted a two-day bench trial on May 25, 2022, and July 8, 2022. The Department presented three witnesses: a Department caseworker, a licensed professional counselor, and a Department investigator. Mother testified on her own behalf.

*Department Caseworker's Testimony*

Lilly Alcorta, a Department caseworker, testified that E.G.K. was removed from Mother's home on June 14, 2021, based on concerns that Mother and the child's alleged father, J.K., were using and selling drugs in Mother's home. Shortly after E.G.K.'s removal, the Department prepared a service plan for Mother, which required her to: (1) locate and maintain stable and legal employment that provided income adequate to support the child and herself for a minimum of six months; (2) provide employment verification and copies of paystubs to her caseworker on a monthly basis; (3) submit to random drug testing; (4) participate in a substance use assessment and follow all recommendations including drug treatment; (5) complete a psychological evaluation with a licensed psychologist and follow all recommendations; (6) attend, participate in, and complete individual counseling; and (7) participate in and complete a parenting class.

Mother completed an outpatient drug treatment program, a parenting education course, and a psychological evaluation, but she failed to complete individual counseling and provide the Department with employment verification and copies of her paystubs. Mother submitted to random drug testing. Her last drug test for the Department was in February 2022 and there were no

concerns about the results. However, the results of her October 2021 and December 2021 drug tests were "concerning." Mother, who was pregnant while this case was pending, indicated to Alcorta that she might test positive for drugs when she delivered her new baby. Alcorta explained to Mother that if she was drug positive at delivery, the Department would be involved with the new baby. Mother asked Alcorta if she should arrange for the new baby's grandmother, who was already caring for E.G.K., to take her new baby home from the hospital.

The Department's concerns about Mother were that she was still using drugs, that she was denying the Department access to her home, that she was not being truthful with the Department, and that she was still involved with J.K., who was involved in criminal activity and had an active warrant for his arrest. One of the issues the counselor had identified in her sessions with Mother was her dependence on J.K. and her need to have access to him. When J.K. was arrested in December 2021, Mother paid over $2000 to bail him out of jail.

Alcorta, who was assigned to this case in February 2022, frequently went to Mother's home to conduct random visits and evaluate the environment. Alcorta attempted visits at Mother's home three times in February 2022, three times in March 2022, and three times in April 2022, but Mother did not answer the door. Alcorta left her card each time, but Mother did not call her back. Mother's truck was sometimes parked in the driveway, which led Alcorta to believe that Mother was there but unwilling to allow the Department access to her home. On February 15, 2022, Alcorta saw J.K. walking the dogs outside of Mother's home. In April 2022, Alcorta spoke to a neighbor, who told her "lots of men" "come in and out" of Mother's home.

Alcorta further testified that Mother moved into a new home sometime in April 2022. On May 9, 2022, Mother allowed a Department investigator, Tera Jones, into her home and Jones did not have any concerns about the home at the time; however, Jones only went into one of the bedrooms and did not see the entire home.

In June 2022, Mother allowed Alcorta and the child's attorney ad litem into her home. This visit occurred after the trial court expressly ordered Mother to allow the caseworker and the ad litem to conduct a home visit.[3] During this visit, Alcorta saw a pair of men's shoes in a bathroom and Mother was unable to tell her who they belonged to.

On July 7, 2022, Alcorta attempted to conduct another home visit, but no one answered the door. Alcorta learned from a Department investigator that Mother said she was going to the hospital that morning to visit her ten-year-old son, who was very ill. Alcorta went to the hospital, but she did not find Mother there. The son's father informed Alcorta that Mother had not been to the hospital all day.

*Counselor's Testimony*

Victoria Caylor, a licensed professional counselor, testified that Mother attended twelve individual counseling sessions with her. Mother missed three counseling sessions, including a June 23, 2022 session, which Mother did not try to reschedule. Caylor and Mother discussed a variety of issues, including Mother's anxiety, substance abuse, poor decision-making, personality issues, and lack of accountability and responsibility. Caylor had not released Mother from individual counseling, and she could not estimate how many more counseling sessions Mother needed to resolve her issues. Mother still needed to address her involvement with J.K., who had a drug problem and an active warrant for drug possession. Mother told Caylor that she was no longer involved with J.K., but Caylor did not think this was true. Mother needed to understand that having

---

[3]After the presentation of the evidence on the first day of trial, the trial court granted a continuance in order for Mother to contend with her ten-year-old child's medical issue. Also, the trial court stated: "I'm ordering [Mother] to allow the Department and [the attorney ad litem] access to [her] home." The trial court further explained to Mother that the Department had "the authority to make random checks" on her home, "see what the environment is like at that time," and "report that back to the Court."

J.K. in her home was not a responsible decision, especially as far as E.G.K. was concerned. Caylor felt that Mother did not have the protective capacity to keep the child safe.

Mother also told Caylor that she was clean and sober. Caylor did not know if this was true, but she believed that Mother was likely to relapse, especially in light of the new stressors in her life, including a new baby and her son's illness and hospitalization. Caylor opined that Mother needed to re-engage in substance abuse treatment and individual counseling.

*Department Investigator's Testimony*

Tera Jones, a Department investigator, testified that the Department had just opened a new case involving Mother's new baby. The new case was based on new allegations of drug use in Mother's home. Jones was assigned to the new case on July 5, 2022, and she made an unsuccessful attempt to visit Mother's home the same day. On July 6, 2022, Jones went to Mother's home again to conduct a visit and she stayed there for about twenty minutes. Mother's truck was parked in the driveway, but Mother did not answer the door. Jones also tried to call Mother, but Mother did not answer her phone. Mother eventually called Jones back and they scheduled a meeting for the next day, July 7, 2022, at 11:00 a.m. However, Mother later canceled this appointment, claiming she needed to go to the hospital to visit her son. Jones later learned from Alcorta that Mother did not go to the hospital as represented. Jones was very concerned that Mother was avoiding the Department.

*Mother's Testimony*

In her testimony, Mother denied that she had ever had a drug problem and claimed that it had been "a year or two" since she had used any illegal substances. However, Mother also admitted that she had a positive drug test result while this case was pending. Mother felt that a relapse plan was not necessary for her because she "actually never really had a drug problem." Mother stated

that E.G.K. was removed from her care because the Department accused J.K. of selling drugs from her previous home. According to Mother, the Department initiated this case because of J.K.

Several months before trial, Mother moved out of her previous home and bought a new home in a gated community. Mother said she was able to afford her new home by selling her old home and using the income she earned from her part-time job, which was managing her family's finances. Her part-time job paid her once a year. J.K. did not move into her new home with her and that it had been "some months" since she had had any contact with him. Mother did not want her parental rights to E.G.K. terminated and she was willing to have no further contact with J.K.

Mother confirmed that her son was very ill and had undergone surgery to remove a tumor. Mother explained that when the caseworker tried to conduct a home visit on July 7, 2022, she was home but did not answer the door because she was taking a nap. Mother further claimed that she visited her son in the hospital later that day. According to Mother, she missed her June 23, 2022 counseling session because of her son's illness. Finally, Mother pointed out that because she owned two cars, it was wrong for the Department to conclude that she was home whenever her truck was in the driveway.

After hearing the evidence, the trial court made predicate findings that Mother had engaged in conduct that violated subsections (O) and (D) under section 161.001(b)(1) of the family code and made a finding that termination was in E.G.K.'s best interest. The trial court then rendered judgment terminating Mother's parental rights.

## STANDARD OF REVIEW

To terminate parental rights under section 161.001 of the family code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(1),(2). In reviewing

the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable [factfinder] could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

### SUBSECTION O FINDING

In her second issue, Mother argues the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(O). Subsection (O) allows for termination of parental rights if the trial court finds by clear and convincing evidence that the parent has "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship" of the Department "for not less than nine months as the result of the child's removal from the parent under Chapter 262 for the abuse and neglect of the child." TEX. FAM. CODE § 161.001(b)(1)(O).

Courts take a strict approach to subsection (O)'s application. *In re K.V.C.*, No. 04-22-00150-CV, 2022 WL 3639511, at *3 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied). "Substantial compliance with a court ordered service plan does not constitute compliance under subsection (O), and a parent's failure to complete one service plan requirement is sufficient to support termination under subsection (O)." *Interest of B.R.T.*, No. 04-22-00416-CV, 2023 WL

29381, at *2 (Tex. App.—San Antonio Jan. 4, 2023, no pet.). However, the family code precludes termination under subsection (O) if a parent proves, by a preponderance of the evidence, that: (1) she was unable to comply with specific provisions of a court-ordered service plan, and (2) she made a good faith effort to comply and her failure to comply was not attributable to any fault of her own. TEX. FAM. CODE § 161.001(d).

On July 13, 2021, the trial court rendered a temporary order which ordered Mother to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." Among other things, the Department's service plan required Mother to: (1) locate and maintain stable and legal employment that provides income adequate to support the child and herself for a minimum of six months; (2) provide employment verification and copies of paystubs to her caseworker on a monthly basis; and (3) attend, participate in, and complete individual counseling. Additionally, the trial court's temporary orders expressly stated that Mother's "counseling sessions shall continue until the counselor determines that no further sessions are necessary or until further order of this Court."

Here, Alcorta, the caseworker, testified that Mother failed to provide the Department with any proof of employment or income. To Alcorta's knowledge, Mother did not work. Caylor, the counselor, testified that Mother missed her June 23, 2022 counseling session and failed to complete individual counseling. In light of this testimony, the trial court could have found that Mother failed to comply with the provisions of her court-ordered service plan by not providing the caseworker with employment verification and copies of her paystubs and by not completing individual counseling. After reviewing the evidence under the appropriate standards of review, we conclude that the trial court could reasonably have formed a firm belief or conviction that Mother failed to comply with all the terms of her court-ordered service plan in violation of subsection (O).

With respect to the affirmative defense under section 161.001(d), the burden was on Mother to prove by a preponderance of the evidence that she was unable to comply with the specific provisions of her court-ordered service plan, and that she made a good faith effort to comply and her failure to comply was not attributable to any fault of her own. *See In re Y.M.L.*, No. 04-19-00168-CV, 2020 WL 1695498, at \*3 (Tex. App.—San Antonio Apr. 8, 2020, pet. denied); *see also* TEX. FAM. CODE § 161.001(d). The only evidence Mother presented about her failure to comply with the court-ordered service plan was her own testimony about not completing counseling. Mother testified that she missed her June 23, 2022 counseling session because of "the stuff going on with [her] son" and that because the case was ending she "didn't know if [she] was supposed to continue" with counseling. As the factfinder, the trial court was free to disbelieve Mother's testimony. *See In re J.O.A.*, 283 S.W.3d at 346 (noting that "the factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor."). Furthermore, Mother did not present any evidence about why she was unable to provide the Department with proof of her employment and income. We conclude there is legally and factually sufficient evidence from which the trial court could reasonably conclude that Mother had not met her burden of proof under section 161.001(d).

We overrule Mother's second issue.

### SUBSECTION D FINDING

Even though only one predicate ground is necessary to terminate parental rights, we must nevertheless address Mother's sufficiency issue regarding subsection (D) "because of the potential consequences for parental rights to a different child." *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019); *see* TEX. FAM. CODE § 161.001(b)(1)(M) (permitting termination of parental rights if a parent has had her rights terminated with respect to another child based on a finding that the parent's conduct was in violation of subsection (D)).

In her first issue, Mother argues the evidence is legally and factually insufficient to support termination under section 161.001(b)(1)(D). The statutory ground for termination found in subsection (D) allows for termination of parental rights if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Under subsection (D), we examine the evidence related to the child's environment to determine if it was the source of endangerment of the child's physical or emotional well-being. *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.). The child's "environment" concerns the suitability of the child's living conditions and the conduct of parents or others in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). "A child is in danger when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Subsection (D) permits termination based on only a single act or omission. *R.S.-T.*, 522 S.W.3d at 109. The relevant period for review of conduct and environment supporting termination under subsection (D) is before the Department removes the child. *Id.*

Inappropriate or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *R.S.-T.*, 522 S.W.3d at 109. "Parental and caregiver illegal drug use and drug-related criminal activity support[] the conclusion that the child's surroundings endanger [her] physical or emotional well-being." *In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 4, 2022, no pet.). Here, there was ample evidence of inappropriate or unlawful conduct in Mother's home during the relevant time period. E.G.K. was removed from Mother's home on June 14, 2021, when she was about two months old. According to the caseworker, the Department's reasons for removing the

child from Mother's home were "concerns of Oxycodone and methamphetamine usage, as well as marijuana and heroin, and possibly selling drugs out of the home." The caseworker said she was not sure if anyone from the Department had been inside Mother's home before E.G.K.'s removal. However, on cross-examination, Mother confirmed that a Department investigator had been in her home before E.G.K.'s removal and "did a whole search of my home and found some unused baggies" and drug paraphernalia. Mother claimed that she did not know who the unused baggies belonged to because it happened "like, two years ago." Mother added that "a lot of people have bags in their kitchen" and that she "didn't see why [that was] a concern." Mother also testified that the Department initiated this case because it accused J.K., who was living with her and E.G.K. at the time, of selling drugs out of Mother's home.

After reviewing the evidence under the appropriate standards of review, we conclude that the trial court could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed E.G.K. to remain in conditions or surroundings which endangered her physical or emotional well-being in violation of subsection (D). We overrule Mother's first issue.

## BEST INTEREST OF THE CHILD

In her third issue, Mother argues the evidence is legally and factually insufficient to support the trial court's best interest finding. Under Texas law, there is a strong presumption that the best interest of the child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether a child's parent is willing and able to provide the child with a safe environment, we consider the factors listed in section 263.307(b) of the family code.[4] TEX.

---

[4]These factors are: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental

FAM. CODE § 263.307(b). In considering these factors, the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *Id*. § 263.307(a). In addition to the factors listed in section 263.307(b), we also consider the non-exhaustive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[5] "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence that proves one or more statutory ground for termination may also prove that termination is in the child's best interest. *Id*. at 28. "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

At trial, much of the Department's evidence focused on Mother's inability to provide E.G.K. with a safe environment. The evidence demonstrated a history of substance abuse by Mother and others who had access to the child's home and an unwillingness by Mother to cooperate with the Department's close supervision, to complete counseling services, and to

---

evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[5]These factors are: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or the proposed placement; (8) the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

effectuate positive environmental and personal changes within a reasonable period of time. Concerns about the use and sale of drugs in Mother's home prompted the Department's involvement in this case. Although Mother moved out of her old home and purchased a new home, she did not cooperate with the Department by allowing the caseworker into her home to evaluate the environment. Additionally, despite Mother's representations to her counselor that she was clean and sober, while the case was pending, Mother tested positive for drugs twice and expressed concerns to her caseworker about testing positive for drugs when she delivered her new baby. Even Mother acknowledged that she had tested positive for drugs at least once while this case was pending. "A parent's drug use supports a finding that termination is in the best interest of the child." *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "The fact finder can give 'great weight' to the 'significant factor' of drug related conduct." *Id*. Furthermore, even if Mother had achieved sobriety by the time of trial, her counselor was concerned that Mother would relapse into drug use based on the new stressors in her life. And, in the event that she did relapse, Mother did not have a recovery plan because she felt that she did not actually have a drug problem.

Significantly, Mother did not complete individual counseling even though her counselor opined that Mother still needed counseling. Mother's counselor expressed concern that Mother had not severed her relationship with J.K., who had an active arrest warrant for drug possession. Although Mother denied that she continued to have contact with J.K., she told the Department that he was the father of her new baby. Additionally, a caseworker had seen J.K. at Mother's new home in February 2022 and she had found men's shoes inside Mother's new home in June 2022. Mother could not tell the caseworker who the shoes belonged to. Although Mother's counselor noted that Mother had made some progress in her parenting skills, she still believed that Mother lacked the protective capacity to keep E.G.K. safe.

As to the stability of the child's placement, E.G.K. was placed with her paternal grandparents shortly after her removal from Mother's care and she remained in their care until the time of trial. All of the child's needs were being met by her grandparents, she was doing "very, very well" while in their care and was "extremely bonded to everybody in the home." While the case was pending, Mother visited E.G.K. regularly and these visits went well. However, the caseworker observed that E.G.K. was "more attached to her grandma and grandpa and aunt" than to Mother. E.G.K., who was almost fifteen months old at the time of trial, had lived in her grandparents' home for most of her life and the Department caseworker believed that she "would really struggle [with] leaving" her grandparents' home. Additionally, the grandparents had almost completed the foster care licensing process and they were willing to take care of E.G.K. for the long term. In the event parental rights were terminated, the grandparents wished to adopt E.G.K.

Based on the totality of the evidence, the trial court could have reasonably found that Mother posed an emotional and physical danger to E.G.K and could not provide her with a safe and stable home environment. After reviewing the evidence under the appropriate standards of review, we conclude that the trial court could reasonably have formed a firm belief or conviction that terminating Mother's parental rights was in E.G.K.'s best interest. We overrule Mother's third issue.

## CONSERVATORSHIP

In her fourth issue, Mother argues the trial court abused its discretion by appointing the Department the sole managing conservator of the child instead of her. However, because we have overruled her challenges to the termination judgment, Mother no longer has any legal rights with respect to E.G.K. and she cannot challenge the portion of the trial court's judgment appointing a managing conservator for E.G.K. *See In re J.M.*, 603 S.W.3d 163, 172 (Tex. App.—Texarkana 2020, no pet.) (affirming order terminating mother's parental rights and holding that she could not

challenge the trial court's conservatorship determination); *In re R.J.*, 579 S.W.3d 97, 120-21 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (holding that because the appellate court overruled father's challenge to the termination judgment, he was divested of his legal rights and duties related to the child and had no standing to challenge the order appointing the Department the child's conservator); *In re L.T.P.*, No. 04-17-00094-CV, 2017 WL 3430894, at *6 (Tex. App.—San Antonio Aug. 9, 2017, pet. denied) (concluding that once the order terminating her parental rights was upheld, mother could not challenge portion of termination order appointing conservators for the child). We overrule Mother's fourth issue.

## CONCLUSION

Because there is legally and factually sufficient evidence to support the trial court's predicate findings under subsections (O) and (D) as well as its best-interest finding, the termination judgment is affirmed.

Liza A. Rodriguez, Justice