## Fourth Court of Appeals
### San Antonio, Texas


## MEMORANDUM OPINION

No. 04-23-00152-CV

**IN THE INTEREST OF N.M.S.**, a Child

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-00274
Honorable Charles E. Montemayor, Judge Presiding

Opinion by: Beth Watkins, Justice

Sitting: Patricia O. Alvarez, Justice
Beth Watkins, Justice
Sandee Bryan Marion, Chief Justice (Retired) (sitting by assignment)

Delivered and Filed: July 5, 2023

AFFIRMED

A.B. appeals the trial court's order terminating her parental rights to N.M.S., a girl born in

October of 2020.[1] A.B. argues the evidence is legally and factually insufficient to support the trial

court's finding that termination is in the best interest of N.M.S. We affirm the trial court's order.

## BACKGROUND

On February 18, 2022, the trial court signed an order authorizing the Texas Department of

Family and Protective Services to remove N.M.S. from the care of her parents, A.B. and M.J.S.

The Department became involved after an altercation between the parents where M.J.S. took

N.M.S., left the home, then returned with the child and continued the altercation. N.M.S. witnessed

---

[1] To protect the privacy of the minor child, we use initials to refer to the child and her biological parents. TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

the altercation. The Department was aware of a long history of domestic violence between A.B. and M.J.S.

The Department obtained temporary managing conservatorship of N.M.S., placed her with N.M.S.'s paternal grandmother, and filed a petition to terminate A.B.'s and M.J.S.'s parental rights. The Department also created family service plans for the parents. A.B.'s family service plan required her to, inter alia, complete individual weekly classes and group classes with Family Violence Preventions Services and remain drug and alcohol free as conditions of reunification. The Department ultimately pursued termination of A.B.'s parental rights.

Twelve months after removal, the trial court held a one-day bench trial at which neither A.B. nor M.J.S. personally appeared. The trial court heard testimony from two witnesses: (1) the Department's initial caseworker, Sandra Groomes; and (2) the Department's final case worker, Danyel Harrigan. At the conclusion of trial, the court signed an order terminating A.B.'s parental rights pursuant to subsections 161.001(b)(1)(D) and (O) as well as its finding that termination of A.B.'s parental rights was in the best interest of N.M.S. A.B. appealed.[2]

## ANALYSIS

A.B. challenges the legal and factual sufficiency of the evidence on which the trial court relied to conclude that termination was in the best interest of N.M.S.

### *Standard of Review*

The involuntary termination of a natural parent's rights implicates fundamental constitutional rights and "divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 683 (Tex. App.—San Antonio 2017, pet. denied) (internal quotation

---

[2] The trial court also terminated M.J.S.'s parental rights to N.M.S. He is not a party to this appeal.

marks omitted). "As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent." *Id.* The Department had the burden of proving, by clear and convincing evidence, both that a statutory ground existed to terminate A.B.'s parental rights and that termination was in the best interest of the child. TEX. FAM. CODE ANN. § 161.206; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re S.J.R.-Z.*, 537 S.W.3d at 683.

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. A factual sufficiency review requires us to consider the entire record to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *See id.* The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

### Best Interest

#### Applicable Law

There is a strong presumption that a child's best interest is served by maintaining the relationship between a child and the natural parent, and the Department has the burden to rebut that presumption by clear and convincing evidence. *See, e.g.*, *In re R.S.-T.*, 522 S.W.3d 92, 97 (Tex. App.—San Antonio 2017, no pet.). To determine whether the Department satisfied this

burden, the Texas Legislature has provided several factors[3] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment. TEX. FAM. CODE ANN. § 263.307(b). The Texas Supreme Court has used a similar list of factors[4] to determine a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

A best interest finding, however, does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at \*5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at \*3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future

---

[3] These factors include, inter alia: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[4] Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

*Application*

Here, the Department's primary concern was domestic violence and the danger it posed to N.M.S. The evidence showed an extensive history of violence between M.J.S. and A.B., and that violence continued to the date of trial. In addition to older charges for domestic violence, M.J.S. was charged with aggravated assault with a deadly weapon, assault of a pregnant person, and violation of a protective order during the legal case. M.J.S. pled guilty to some of these charges and was currently sentenced to ten years' probation and no contact with A.B., although he continued to tell the caseworkers he "beat" the charges.

A.B. confirmed that there had been domestic violence in the relationship, that M.J.S. had assaulted her with a weapon, and that he was verbally abusive towards her as well. A.B. reported to the Department that one time, N.M.S. "was in the playpen next to where all this domestic violence was happening." After this incident, Groomes talked "in great detail" with A.B. about ending her relationship with M.J.S. and how it could jeopardize "her potentially reunifying back with her daughter if she continued, you know, her relationship with the abuser." At the beginning of the case, A.B. told Groomes, "I want to get a divorce from him. I don't want to be with him anymore. I'm going to get a protective order. He's on an ankle monitor. He cannot be anywhere near me." However, the evidence showed A.B. continued seeing M.J.S. in violation of the protective order.

Later in the case, A.B. reported to Groomes that she was no longer with M.J.S. But Groomes testified:

> And then, I go to lunch. It was on September 30th, and I went to Wingstop with my coworker and I saw [A.B. and M.J.S.] both going into the Goodwill

together holding hands, like all lovey dovey. And I'm like, "Oh, my God, what are they doing?"

And so, I confronted them both in the Goodwill. And the father just went one way running out the store. And the mother got all nervous. And I said, "Well, what's going on? You told me you weren't with him anymore."

She didn't know what to say. . . .

I followed up with her. And they continued to both deny, deny, deny. Like I didn't see them. They didn't want to take any kind of responsibility or accountability for that. They just kept denying. And - - And it's just their credibility both, just very questionable, yeah.

Harrigan reviewed a name and address survey the Department ran and testified "[t]hroughout the legal case, it shows that they had continued a relationship." Despite having the opportunity to break away from M.J.S., both Groomes and Harrigan testified that A.B. had not done so. Although it appeared that A.B. was generally the victim of M.J.S.'s violence, Harrigan testified that the violence was "happening on both sides," and A.B. had also been charged with assault.

When asked whether contact with A.B. would significantly impair N.M.S.'s emotional development, her physical health, or her physical safety, Groomes answered "no." But that testimony was limited to contact between N.M.S. and her mother. According to Harrigan:

The biggest danger would be the exposure that [N.M.S.], which is the two-year-old-child, would be put into, should she get reunified with mom, that exposure to the domestic violence between her and dad.

[N.M.S.] is two years old. She doesn't have the capability to protect herself, to try to call a neighbor, or call 911. She would just be subjected to enduring what's going on around her or possibly even be caught in the middle of it. . . .

Groomes testified that the continued family violence and instability of both parents led her to conclude that it would be harmful for N.M.S. to leave the care of her grandmother and be placed back into the care of A.B. Groomes feared "that the violence will continue with both the parents, because it has throughout the whole legal case."

Groomes testified that neither parent has been able to show that they have the ability to provide for the physical and mental welfare of N.M.S. in the future. She explained the basis for that conclusion was their tumultuous relationship and that neither parent could provide a stable

home for their daughter. *See* TEX. FAM. CODE § 263.307(b)(1) (evaluating child's age and physical/mental vulnerabilities); TEX. FAM. CODE § 263.307(b)(3) (examining magnitude/frequency/circumstances of the harm to child); TEX. FAM. CODE § 263.307(b)(7) (assessing history of abusive or assaultive conduct by family or others who have access to the child's home). As the Department notes in its brief, the continuing domestic violence led the case workers to conclude A.B. could not provide N.M.S. with a safe and stable environment and protect her from future physical and emotional danger. *See, e.g., In re A.L.S.*, 660 S.W.3d 257, 264 (Tex. App.—San Antonio 2022, pet. denied) ("It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards."). It is in the best interest of a child to not be placed in conditions or surroundings that endanger the child's physical or emotional well-being. *See id*. at 275 ("Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest.").

In terms of importance, the Department's second concern was A.B.'s drug use. "Continued illegal drug use [by the parent] . . . is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child." *In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at *5 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.).

After receiving a referral from the Department, A.B. successfully completed an outpatient drug treatment program. Twice while the case was pending, though, A.B. tested positive for cocaine, including near the end of her outpatient drug treatment program. A.B. disagreed with the result of that test, which occurred three months before the trial. But she agreed that a positive result on a test she took seven months before trial was valid. Despite the fact that A.B. had completed the drug treatment program, the positive test results led Groomes to conclude that A.B. had not

adequately addressed her drug abuse issues. Groomes held this belief even though A.B. tested negative on a drug test the month before the trial. According to Groomes, "it's just not a long enough period of sobriety to say that . . . that mom is actually sober and can maintain that sobriety." *See, e.g.*, *In re A.L.S.*, 660 S.W.3d at 275–76 (recognizing "drug use can destabilize the home and expose children to physical and emotional harm if not resolved").

Groomes did, however, credit A.B. for engaging in services right away. And, as A.B. points out on appeal, she completed parenting and domestic violence classes. However, another incident of domestic violence occurred even while A.B. was working voluntarily to complete the domestic violence classes. And the domestic violence continued after the legal case started, when A.B. was living on her own and M.J.S. violated the protective order. Harrigan downplayed A.B.'s completion of the parenting and domestic violence classes because "she continues to go back and repeat the cycle despite resources being provided on at least two occasions."

A.B.'s family service plan also required her to attend counseling. At the time of trial, A.B. had not been successfully released from counseling. Harrigan explained that A.B. was "missing some sessions and she is giving inconsistent reasons why she's missing the sessions to me and the counselor." Harrigan testified, "the counselor believes that she's still having contact with the father." *See* TEX. FAM. CODE § 263.307(b)(10) (evaluating willingness and ability of child's family to seek out, accept, and complete counseling services).

Harrigan testified that A.B. had not appropriately addressed the concerns that led to N.M.S. coming into care, primarily because of her "continued relationship with the father." She explained, "[t]he services are not a checklist. It's supposed to be accompanied with behavioral changes. And despite being provided with those services on two occasions, she still is engaged in a relationship with him that resulted in domestic violence or breaking of the protective order." Neither of the caseworkers believed A.B. had demonstrated that she could effectuate positive environmental and

personal changes. *See* TEX. FAM. CODE § 263.307(b)(11) (reviewing willingness and ability of child's family to effect positive environmental and personal changes in a reasonable time); TEX. FAM. CODE § 263.307(b)(12) (inquiring whether the child's family demonstrates adequate parenting skills).

The Department expected A.B. to obtain employment and provide her caseworkers with pay stubs, but she never did. Instead, she explained that she wanted to focus on her services, which she didn't feel she would be able to do if she was working. Groomes was unaware of any reason A.B. would be unable to work. Similarly, during the case, Harrigan testified A.B. had never provided financial support for her child. She did, however, provide proof of an appropriate home for herself and N.M.S. And Groomes admitted A.B. was fairly consistent in her visits and would always bring snacks and extra clothes for N.M.S.

Finally, the *Holley* factors instruct us to evaluate the child's desires. *Holley*, 544 S.W.2d at 371. When a child is too young to express her desires, the trial court may consider whether the child has bonded with the foster family, is well cared for by them, and has spent minimal time with the parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Here, N.M.S. was one year old when she came into care; she was two years old when the case went to trial. She was too young to express her desires regarding termination, but the trial court heard testimony that, although there was a bond between N.M.S. and her mother, the child was happier to see her father during his visits. Groomes further testified that the grandmother with whom N.M.S. had been placed was doing a good job caring for her and that placement could lead to permanency. *See* TEX. FAM. CODE § 263.307(b)(1) (considering child's age and physical/mental vulnerabilities). In the grandmother's care, Groomes testified that N.M.S. is "very healthy, on target, [a] very healthy baby girl."

On appeal, A.B. asserts that notwithstanding Harrigan's conclusory statement that parental rights need to be terminated so N.M.S. can stay in her current placement, parental rights did not need to be terminated in order for the child to remain in her grandmother's care. According to A.B., "Harrigan testified the grandmother would continue to be a permanent placement for the child even if the parents kept some sort of supervised visitation." But the evidence established that N.M.S. experienced stability while living with her grandmother and the grandmother demonstrated a healthy protective capacity. The trial court could have properly credited this evidence in determining that termination of A.B.'s parental rights and N.M.S.'s adoption by her grandmother were in the child's best interest. *See, e.g.,* TEX. FAM. CODE § 263.307(b)(7), (8), (10), (11), (12).

After reviewing the evidence under the appropriate standards of review, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of A.B.'s parental rights was in the best interest of N.M.S. *In re J.F.C.*, 96 S.W.3d at 266. We therefore hold legally and factually sufficient evidence supports the trial court's best interest finding, and we overrule A.B.'s arguments to the contrary.

## CONCLUSION

We affirm the trial court's order of termination.

Beth Watkins, Justice